INTERNATIONAL SOCIETY FOR KRISHNA CONSCIOUSNESS OF WESTERN PENNSYLVANIA, INC., a non-profit religious organization, Individually and on behalf of the Members thereof, and Howard D. Fawley, Dennis Gorrick, Theresa Fawley, Robert Bauer, Susan Yodel, Joseph Campbell, Charles Link, Jonathan Kaufmann, Nancy Vilanelli, Mike McQue, Mary St. John, Barbara Wolf, Suzanne Bladeau, Charlotte Winczer, Mary Riggan, Linda Zacharias, and Marcia Rankin, Plaintiffs,

v.

Martin J. GRIFFIN, Individually and in his official capacity as Director of the Department of Aviation of the County of Allegheny, Robert Kroner, Individually and in his official capacity as Superintendent of the County Police, Leonard C. Staisey, Thomas J. Foerster and William R. Hunt, M. D., Individually and in their official capacities as Commissioners of the County of Allegheny, and County of Allegheny, Defendants.

Civ. A. No. 75–1350.

United States District Court, W. D. Pennsylvania.

Sept. 23, 1977.

George L. Cass, Buchanan, Ingersoll, Rodewald, Kyle & Buerger, Pittsburgh, Pa., for plaintiffs.

Alexander J. Jaffurs, County Sol., James Victor Voss, Asst. County Sol., Pittsburgh, Pa., Allegheny County Law Department, for defendants.

## MEMORANDUM OPINION AND ORDER

### FACTS

TEITELBAUM, District Judge.

In October of 1975, the plaintiffs commenced a civil rights action against the then County Commissioners and the Airport Director, to obtain recognition of their right to distribute literature and solicit funds at the Greater Pittsburgh International Airport on behalf of their religion. An Order was entered on December 2, 1975, recognizing the plaintiffs' rights to conduct their activities on the premises of the airport, but imposing restrictions on the conduct of such activities in certain areas where an interference with the functions of the Airport might result.[1] Defendants have now adopted an ordinance regulating the Greater Pittsburgh International Airport and the County Airport. The Ordinance was adopted by the County of Allegheny upon the basis of and intended to be in accordance with Paragraph 3(f) of the December 2, 1975 Order of Court.

The Ordinance adopted by the County of Allegheny provides *inter alia*, that any person desiring to distribute literature or solicit funds for non-profit charitable or religious purposes must first obtain a written permit from the Director of Aviation, the permit to be issued upon the payment of a

1. A copy of the December 2, 1975 Order is attached as Appendix A.

$10.00 per day fee, only two permits can be issued for any one day, solicitation of funds must be limited to a booth designated by the Director of Aviation in one of the permissible solicitation areas designated by the Director of Aviation in one of the permissible solicitation areas designated in the Ordinance, and solicitation of funds is absolutely prohibited for 48 days of the year surrounding certain holidays and during the rush hours on Sunday, Monday and Friday.[2]

On September 2, 1977, two members of plaintiffs' religion were issued citations by Allegheny County police officers for failure to obtain a permit in compliance with the new County Ordinance regarding solicitation at the Greater Pittsburgh International Airport. At the time of issuing the citations, the County officers indicated that subsequent violations would bring further citations possibly resulting in incarceration. Because of these threats of future citations, both members of plaintiffs' religion ceased distributing literature and soliciting funds. Plaintiffs then moved for an Order adjudging the defendants in contempt for having violated the terms of the December 2, 1975 Order of Court. Resolution of the contempt motion was stayed pending disposition of defendants previously filed motion to vacate the December 2, 1975 Order of Court. This decision, therefore, will be dispositive of both the motion to vacate and the motion for contempt.

## DISCUSSION

"Background of International Society for Krishna Consciousness (ISKCON)."

■ Plaintiff International Society for Krishna Consciousness (hereinafter referred to as ISKCON) is a religious society which espouses the missionary views of Hinduism as expressed by the Hindu denomination, Krishna Consciousness. The society maintains temples and schools in cities throughout the United States and the world, including Dallas, Los Angeles, San Francisco, Montreal, Paris, Singapore, Tokyo and India. The Krishna religion imposes upon its followers the obligation to perform a religious ritual known as Sankirtan, which requires disseminating and selling of religious publications and soliciting contributions in public places. Sankirtan is directed to spreading ISKCON's religious beliefs, attracting new followers, and financially supporting their religious activities. *Cf. ISKCON v. Englehardt*, 425 F.Supp. 176, 178 (W.D.Mo.1977). In light of the foregoing religious roots of ISKCON, it must be concluded that their literature distribution and fund solicitations are motivated by their religion and constitute a form of First Amendment expression.

"Legal Context"

■ The principle that the First Amendment protects religious literature distribution and solicitation of funds to support one's religion was established by the United States Supreme Court in *Murdock v. Pennsylvania*, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943). In *Murdock*, it was held that an ordinance imposing a flat license tax, not a mere nominal fee, for the privilege of canvassing or soliciting within a municipality is, when applied to Jehovah's Witnesses engaged in the dissemination of their religious beliefs through the sale of books and pamphlets by solicitation from house to house, an unconstitutional invasion of the rights of freedom of religion and of speech and press. *Murdock* emphasized that the Constitutional protection of the First Amendment is not confined to conventional religions, but also includes the spreading of religious beliefs through the distribution of religious literature and personal contact.

■ Some two and a half decades later the High Court reinforced the rationale of *Murdock* in enunciating the principle that a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional. *Shuttlesworth v. Birmingham*, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969). In *Shuttlesworth*, it was held that a city ordinance making it an

---

2. A copy of the relevant Section of the Ordinance is attached as Appendix B.

offense to participate in any parade or procession or other public demonstration without first obtaining a permit from the city commission and authorizing the members of the commission to refuse a permit if required to by "public welfare, peace, safety, health, decency, good order, morals or convenience," is unconstitutional, since it subjects the exercise of First Amendment freedoms to the prior restraint of a license without narrow, objective, and definite standards to guide the licensing authority.

Having delineated the scope of First Amendment protection as set forth in *Murdock* and *Shuttlesworth*, it is now necessary to examine those procedural safeguards which have been deemed essential in order to effectuate the Constitutional dictates of those decisions. In *Freedman v. Maryland*, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965), it was held that a process which requires the prior submission of a film to a censor avoids constitutional infirmity only if it takes place under the following standards designed to obviate the dangers of a censorship system: 1) the burden of proving that the film is unprotected expression must rest on the censor; 2) the exhibitor must be assured, by statute or authoritative judicial construction, that the censor will, within a specified brief period, either issue a license or go to court to restrain showing the film; 3) any restraint imposed in advance of a final judicial determination on the merits must similarly be limited to preservation of the status quo for the shortest fixed period compatible with sound judicial resolution; and, 4) the procedure must assure a prompt final judicial decision. The Constitutional policy underlying *Freedman* is even more compelling when the subject matter of dissemination concerns religious practice rather than entertainment. *ISKCON v. Eaves* (N.D.Ga., May 3, 1976).

"Ordinance"

Bearing in mind the preceding fundamental Constitutional precepts arising under the First Amendment, we now turn to a review of the Constitutionality of the relevant provisions of defendants' new ordinance.

■ The provisions at issue are contained in Section 9(B) of the ordinance. (See Appendix B.) The initial provisions of 9(B)(1) and (B)(2) itemize *inter alia* the desired purposes and goals of the legislation. While the purpose stated is a salutary one, the substantive provisions are in many instances overly restrictive of First Amendment freedoms. Adoption for a salutary purpose will not save what is otherwise a Constitutionally deficient regulation of expression. Cf. *ISKCON v. Rochford*, 425 F.Supp. 734 (N.D.Ill.1977).

■ The first area of the ordinance which is Constitutionally suspect is the permit procedure of 9(B)(3) through 9(B)(5). Under these provisions no person or organization desiring to distribute literature or solicit funds for non-profit religious purposes may do so within the airport unless a permit is obtained from the Director of Aviation. The fee for such a permit is $10.00 per day and only two permits for any one day may be issued.

It is beyond dispute that a tax laid specifically on the exercise of one's First Amendment Constitutional rights is itself unconstitutional. *Murdock v. Pennsylvania, supra*. As stated in *Murdock*, "freedom of speech, freedom of the press, freedom of religion are available to all, not merely to those who can pay their own way." *Murdock, supra*, 319 U.S. at 111, 63 S.Ct. at 874. The payment of $10.00 per day would guarantee that many people could not afford to exercise their Constitutional rights. A muting of Constitutional expression is both inevitable and intolerable when conditioned on such a substantial financial obstacle. The $10.00 permit fee is therefore declared void.

Additionally, the provision limiting the number of permits to two a day is unduly restrictive of First Amendment rights. Religious beliefs should not be suppressed by an artificially low permit limit which is unrelated to the free and orderly functioning of the airport. The defendants have failed to demonstrate any necessity for a

two permit restriction. Absent some showing of compelling need, First Amendment rights cannot be so easily relegated to such a minor role at the airport. Accordingly, the Director shall henceforth be authorized to issue six (6) permits for any day. Such a number, while admittedly arbitrary, more closely approximates the desired accommodation between First Amendment expression and orderly functioning of the airport.

■ Section 9(B)(4) provides that if a permit is denied, the applicant can appeal the decision within thirty days to the Board of County Commissioners. The issue is whether such an appellate procedure comports with the Constitutional safeguards deemed necessary in the First Amendment area.

The application of *Freedman v. Maryland, supra,* to the case *sub judice* results in the invalidation of Section 9(B)(4) insofar as it requires the applicant to initiate an appeal from the denial of a permit. *Freedman* is authority for the proposition that the County must either issue a permit or itself affirmatively seek court approval of their decision within a brief period. The rationale for such a position is that absent the County bearing the burden of initiating swift judicial review, the time-consuming appellate process will cause ISKCON followers to forego their right to appeal. *Cf. Freedman v. Maryland, supra,* 380 U.S. at 54, 58, 85 S.Ct. at 739. "Because only a judicial determination in an adversary proceeding ensures the necessary sensitivity to freedom of expression, only a procedure requiring a judicial determination suffices to impose a valid final restraint." *Freedman v. Maryland, supra,* at 58, 85 S.Ct. at 739. Accordingly, the County must apply to a court of record having jurisdiction within ten days of the denial of a permit to obtain judicial review of such a restriction on ISKCON's First Amendment rights.

■ The last aspect of the permit procedure which necessitates judicial scrutiny is Section 9(B)(4)(A). That section sets forth the permissible reasons for the denial, refusal or cancellation of a permit. These reasons must be measured by the Constitutional yardstick of *Shuttlesworth v. Birmingham, supra,* to determine whether they set forth narrow, objective and definite standards for the guidance of the Director of Aviation.

Upon examination of the five reasons which can be the basis of a permit denial, we find all except 9(B)(4)(A)(4) to be Constitutionally proper.

■ In spite of plaintiffs' argument that 9(B)(4)(A)(1) and (3) are overbroad and vest standardless discretion in the Director of Aviation, we find that such provisions are sufficiently definite to comply with the First Amendment. As stated in *ISKCON v. Eaves,* F.Supp. (N.D.Ga. Dec. 27, 1976):

"Plaintiffs would have each of the disputed words in Section 9 clearly defined. However, all words are malleable and open to some interpretation and the cases construing limitations on First Amendment rights do not require definition upon definition, nor do they require that no discretion be vested in administrative officials. Condemned to the use of words, we can never expect mathematical certainty from our language."

Accordingly, 9(B)(4)(A)(1) and (3) can be stamped with the Constitutional imprimatur.

■ Plaintiffs attack 9(B)(4)(A)(5) alleging that under its terms the entire membership of ISKCON can be denied its First Amendment rights because of one member's violation of a rule or regulation of the airport. Presumably, however, applicants for permits will be the individual ISKCON followers and not the religious group as a whole. Thus, ISKCON would not be the agent or representative of the applicant but rather the applicant would be the agent or representative of ISKCON. Should the provision be applied in a manner to taint religious followers who have violated no rules or regulations, ISKCON retains the remedy of challenging such application before the court of record selected by the County as hereinabove set forth. On its face, however, 9(B)(4)(A)(5) is not Constitutionally defective.

■ Plaintiffs also attack Section 9(B)(4)(A)(2) on the ground that the Director of Aviation cannot be invested with the authority to determine if religious solicitation is fraudulent or bona fide. There is substantial support for plaintiffs' position in some of the High Court's holdings. *Schneider v. State,* 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939); *Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). Those decisions focused upon the undesirability of any licensing authority acting as a censor of First Amendment expression. They did not consider the procedural safeguards which were subsequently set up by the Court in *Freedman v. Maryland, supra,* vintage 1965. In light of the County's obligation to apply to a court of record having jurisdiction within ten days of the denial of any permit as directed by today's decision, the abrasiveness of the Director of Aviation's initial ruling on Constitutional freedoms is considerably diminished. Viewed in the context of Freedman's guaranteed judicial review, 9(B)(4)(A)(2) outlines a proper function of the Director of Aviation.

■ Section 9(B)(4)(A)(4), however, is clearly unconstitutional for failure to provide a narrow, objective and definite standard to aid the Director of Aviation. *Shuttlesworth v. Birmingham, supra,* invalidated an almost identical ordinance provision which allowed the City public officials to decide whether or not the granting of a permit served the public interest. Such a standard contains overly broad criteria which can only result in the Director of Aviation applying his own notion of the public interest. This provision is so completely amorphous that it cannot be sustained even with the realization that judicial review of its violations would occur within ten days. Accordingly, Section 9(B)(4)(A)(4) is hereby invalidated.

While Section 9(B)(7) overall is a proper implementation of the general guidelines set forth in Paragraph 4 of the December 2, 1975 Order of Court, 9(B)(7)(C) and (E) require a somewhat closer analysis.

■ Section 9(B)(7)(C) purports to restrict ISKCON activity to within ten feet of any area leased exclusively to a tenant of the airport. However, paragraph 3(c) of the Order of Court merely limits ISKCON evangelism when conducted at entrances or exits. This Court finds that interference with the operation of the airport should be the standard by which regulations are measured, rather than an arbitrary physical distance from specific airport areas. Accordingly, since defendants' regulation in 9(B)(7)(C) is inconsistent with the prior Order of Court and no showing of necessity as required by Paragraph 3(f) of said Order has been made, Section 9(B)(7)(C) is hereby declared invalid.

■ Section 9(B)(7)(E) prohibits the solicitation of funds by ISKCON members for 48 days of the year surrounding certain holidays and during the rush hours on Sunday, Monday and Friday. Section 9(B)(7)(E), like the ordinance in its entirety, is alleged to have been enacted by defendants pursuant to paragraph 3(f) of the prior Order of Court which provides for the enactment of "other *reasonable* rules and regulations." The prohibition of solicitation on holidays and during rush hours is patently unreasonable. It is precisely at these prohibited times that ISKCON's religious activities are likely to be most effective. The prohibition of 9(B)(7)(E) provides a forum for ISKCON's First Amendment expression only during periods when there are the least number of persons around to listen. The First Amendment was not designed to allow expression only when its effects are destined to be futile. Accordingly, Section 9(B)(7)(E) is hereby deemed an overly broad restriction on ISKCON's First Amendment rights and is henceforth invalid.

The last provisions of the ordinance which require comment are 9(B)(9) and 9(B)(10)(C). The initial problem with 9(B)(9) is that those areas which are therein defined as permissible for solicitation are characterized graphically on floorplan maps of the airport. These maps are confusing and fail to alert the public in general, and this Court in particular, as to which parts of the airport are allowable areas of solicita-

tion. Accordingly, the term *"area"* used in 9(B)(9) cannot be restricted to its purported definition in 9(B)(8) until such time as the floor plans are made more readily understandable and this Court has had an opportunity to assess the validity of such restrictions.

▇ Secondly, Sections 9(B)(9) and 9(B)(10)(C) require that solicitations occur only from designated solicitation booths and that any exchange of money must take place in such booths. This provision is likely to discourage contributions by requiring the traveler to go to a specific location if he desires to make a contribution. Most people are unlikely to go out of their way on their own initiative to make a contribution. Thus, the ISKCON members would be denied, or at least restricted in, the opportunity to solicit funds from those travelers who do not pass near the designated booth area. The defendants have asserted no justification for limiting ISKCON's First Amendment rights in such a manner. Accordingly, neither solicitation by ISKCON members nor exchanges of money can be confined to "solicitation booths."

"Amendment of Order"

▇ Having conducted a seriatim review of the Constitutionality of defendants' ordinance, we must now confront a problem which is not specifically addressed in either the December 2, 1975 Order of Court or the subject ordinance. This Court is aware of a practice by ISKCON members whereby the solicitor will pin a flower on the prospective donor without his consent and prior to any indication that the prospective donor wishes to make a contribution. As a result, there have been altercations arising out of ISKCON's attempted solicitation of funds. Defendants have taken the position that these assault and battery matters are private actions and the assaulted person should be required to file a complaint before the local magistrate. Defendants' position is untenable because it ignores the realities of human behavior. Almost all travelers will elect to forego filing a complaint for an assault, which although it represents a continuing

course of harassing conduct vis a vis the airport travelers, is minor in stature. Ratification of defendants' view would in effect sanction ISKCON's conduct and leave the transient group of airline passengers without a practical remedy. Accordingly, the December 2, 1975 Order of Court is hereby amended to include a provision prohibiting any physical contact by the ISKCON follower with the prospective donor unless said donor has either consented or already agreed to make a contribution.

"Motion for Contempt"

▇ As it appears to this Court that defendants acted in good faith when enforcing the terms of the ordinance in dispute *sub judice*, plaintiffs' motion for a contempt judgment and costs of this proceeding will be denied.

CONCLUSION

The decision *sub judice* is an attempt to guarantee the protected rights of ISKCON under the First Amendment and at the same time allow the defendants sufficient latitude to enact reasonable regulations which will prevent undue interference with the transportation function of the airport. It must be remembered that each case is circumscribed by its facts and therefore we intimate no opinion whatsoever as to the Constitutionality of Section 9(A) of the defendants' ordinance which concerns commercial speech. It is this Court's hope that the defendants will use the guidelines set forth in today's Opinion to construct an ordinance which complies with the Constitutional directives of the First Amendment.

An appropriate Order will issue.

ORDER

AND NOW, to-wit, this 23rd day of September, 1977, in accordance with the foregoing Opinion in the above-captioned case, IT IS ORDERED that defendants' motion to vacate the Court Order of December 2, 1975 be and the same is hereby denied; IT IS FURTHER ORDERED that defendants' new ordinance adopted by the County of

Allegheny on July 21, 1977 with an effective date of September 1, 1977 be incorporated into the Court Order of December 2, 1975 pursuant to Paragraph 3(f) of said Court Order except for the following provisions of said ordinance which are held invalid for the reasons set forth in the foregoing Opinion:

(1) Section 9(B)(4)'s opening paragraph insofar as it purports to exact a $10.00 per day permit fee and insofar as it purports to require the applicant to initiate an appeal from a permit denial;

(2) Section 9(B)(4)(A)(4);

(3) Section 9(B)(7)(C);

(4) Section 9(b)(7)(E);

(5) Section 9(B)(8);

(6) Section 9(B)(9) insofar as it purports to require the establishment of *"solicitation booths;"*

(7) Section 9(B)(10)(C);

IT IS FURTHER ORDERED that Section 9(B)(6) of said ordinance be and the same is hereby amended to allow six (6) permits for any day. As amended, said Section is incorporated into the aforementioned Order of Court.

IT IS FURTHER ORDERED that the defendants must apply to a Court of Record having jurisdiction within ten (10) days of the denial of a permit in order to obtain judicial review of such a restriction on ISKCON's First Amendment rights;

IT IS FURTHER ORDERED that ISKCON members are prohibited from initiating any physical contact with prospective donors unless said donor has either consented or already agreed to make a contribution;

IT IS FURTHER ORDERED that plaintiffs' motion for a contempt judgment be and the same is hereby denied in accordance with the foregoing Opinion.

## APPENDIX A

### ORDER

Upon the pleadings and arguments of counsel, the Court finds that:

1. Plaintiffs and members of Plaintiff Society have certain protected rights under the First Amendment to the United States Constitution to freely practice their religion, espouse their beliefs, and disseminate information in public areas, including the Terminal Building of the Greater Pittsburgh International Airport.

2. Plaintiffs and members of Plaintiff Society have the right under the First Amendment to the United States Constitution to solicit donations for religious paraphernalia from the general public, to be used in the furtherance of their religion, provided that the devotee shall not mislead or defraud the person solicited.

3. The provisions of Article I, Section 9 of the County Ordinance adopted July 29, 1959, as amended October 19, 1965, with respect to solicitation and the distribution of handbills and other written material may not constitutionally be applied to Plaintiffs or members of Plaintiff Society, in the exercise of their religious beliefs and practices.

4. Defendants have the right to protect the general public, in its use of the Terminal Building of Greater Pittsburgh International Airport, from undue obstruction of traffic, undue hinderance of activity, and undue interference with its orderly and lawful business.

5. Defendants have the right to proscribe and prosecute such activity as would constitute a breach of the peace and/or a violation of duly enacted laws of the County of Allegheny or the Commonwealth of Pennsylvania, and may freely enforce such laws, when violated, against Plaintiffs or members of Plaintiff Society, provided that Plaintiffs and members of Plaintiff Society reserve the right to challenge the validity of any laws on their face or as applied to them.

Accordingly, for good cause shown, IT IS ORDERED that:

1. Plaintiffs and members of Plaintiff Society shall be allowed to engage in such activities as are protected by the First Amendment to the United States Constitution, including the right to espouse and

practice their religion, and disseminate information, both written and oral, in regard to their religion, and distribute religious paraphernalia, so long as such activity does not unduly disrupt the orderly business of the Airport. Defendants are restrained from prohibiting such activity, and from unreasonably impeding, hindering, or interfering with such activity.

2. Plaintiffs and members of Plaintiff Society shall be allowed to solicit funds from the general public to be used in the furtherance of their religion provided that such funds are neither demanded nor required in a misleading manner. Defendants are restrained from prohibiting Plaintiffs or members of Plaintiff Society from so soliciting funds, from unreasonably impeding, hindering, or interfering with such activity, and from arresting or prosecuting Plaintiff or members of Plaintiff Society, for such activity.

3. In order to prevent the obstruction of normal Airport business, Plaintiffs and members of Plaintiff Society, shall be subject to the following restrictions in carrying out their activities in the Airport Terminal:

a. Plaintiffs and members of Plaintiff Society shall refrain from carrying out their activities between the entrances to the airfield and the presently existing security check points.

b. Plaintiffs and members of Plaintiff Society shall refrain from leaving bags or other containers of written material or religious paraphernalia or other personal property unattended in any area of the Airport Terminal.

c. Plaintiffs and members of Plaintiff Society shall generally refrain from carrying out their activities in a manner that obstructs or interferes with free public access to any entrance or exit to the Terminal Building, to any concession or shop, to any stairwell, elevator or escalator, or to any security entrance or device.

d. Plaintiffs and members of Plaintiff Society shall refrain from conducting their activities in any exclusively leased area, such as any exclusively leased baggage claim area, exclusively leased ticket counter area or exclusively leased holding area. "Exclusively leased area" means an area which, under the terms of a written lease between the County of Allegheny and a tenant or concessionaire is only available to tenant or concessionaire or its invitees.

e. Not more than one (1) Plaintiff shall carry out their activities within the constricted area where each of the three airport concourses branches out from the main concourse.

f. The above restrictions shall be subject to such other reasonable rules and regulations as from time to time may be deemed necessary by Airport management, providing such rules and regulations have uniform application to all members of the general public and provided that Plaintiffs and members of Plaintiff Society reserve the right to challenge the constitutional validity of any such rule and regulation.

4. Forthwith, the Defendants shall notify their agents and employees of the terms of this Order and shall instruct their agents and employees that they must not take any action inconsistent with the terms of this Order.

5. Defendants shall have the right to enforce any and all duly enacted laws of the County of Allegheny or the Commonwealth of Pennsylvania when the acts of Plaintiffs or members of Plaintiff Society constitute a violation thereof and/or a breach of the peace, provided that Plaintiffs and members of Plaintiff Society reserve the right to challenge the validity of any such laws on their face or as applied to them.

6. Jurisdiction is retained by this Court for the purpose of enabling any of the parties to this Order to apply to this Court at any time for such further orders and directions as may be necessary or appropriate for the construction or implementation of this Order, for the modification of any of the provisions hereof, for the enforcement of compliance therewith, and for the punishment of violations thereof.

IT IS SO ORDERED.

(s) Ralph F. Scalera, J.
Ralph F. Scalera

## APPENDIX B

SECTION 9. *Soliciting*

A. No person shall sell or offer for sale any article or service for hire on, in, about or within the limits of the Airport, or set up therein any stand or booth for such purpose or distribute or display handbills, cards or advertisements of any nature whatsoever or engage in any business or commercial activity of any nature whatsoever on, in, about or within the limits of the Airport, unless duly authorized by the Director to do so; nor, except as set forth in Section 9B, below, shall any person solicit funds on, in, about or within the Airport unless duly authorized by the Director to do so.

B. 1. Any person or organization desiring to engage in activities at the Airport which involve the exercise of constitutional freedoms, including but not limited to distribution of non-commercial, non-obscene, non-subversive literature, shall be protected in such activities, provided that the same do not constitute commercial activities and do not result in interference with the transportation function of the Airport.

2. The terms and conditions hereinafter set out are hereby declared to be necessary for the accomplishment of the following purposes:

(A) To insure that persons seeking to exercise constitutional freedoms of expression can communicate effectively with users of the Airport;

(B) To insure adequate nearby police facilities for the protection of persons exercising their constitutional freedoms;

(C) To insure that only non-profit charitable or religious organizations are permitted to solicit funds on the Airport premises;

(D) To insure that properly authorized persons and organizations seeking to solicit funds have adequate exposure to the traveling public;

(E) To restrict such activities to public areas of Airport buildings and premises;

(F) To protect persons using the Airport from repeated communications or encounters which might constitute harassment or intimidation; and

(G) To insure the free and orderly flow of pedestrian traffic through the Airport premises.

3. Any person or organization desiring to distribute literature or solicit funds for non-profit charitable or religious purposes on, in, about or within the Airport shall first obtain a written permit therefor from the Director of Aviation ("Director"). For purposes of obtaining such permit, there shall be submitted to the Director a written application in the form prescribed by the Director setting forth at least the following:

(A) The full name, mailing address and telephone number of the person or organization sponsoring, promoting or conducting the proposed activities;

(B) The full name, mailing address and telephone number of the individual person or persons who will have supervision of and responsibility for the proposed activities;

(C) The full name, mailing address and telephone number of the individual person or persons who will be engaged in the proposed activities at the Airport;

(D) The subject matter of the proposed distribution or communication, and the purpose thereof;

(E) A description of the proposed activities, indicating the type of communication to be involved;

(F) The dates and hours on and during which the activities or solicitation are proposed to be carried out, and the expected duration of the proposed activities; and

(G) The purpose of the solicitation.

4. The permit shall be issued upon the payment of the permit fee of $10.00 per day, within five (5) days following receipt of the application by the Director or the applicant shall, within said five (5) day period, be furnished a written statement indicating the reasons why the permit will be

denied; provided, that in no event shall the Director issue a permit for a period of time in excess of ninety (90) days. In the event that any permit hereunder is denied, by reason of unusual or emergency conditions at the Airport, or for other valid reason, the applicant shall have thirty (30) days to appeal the decision of denial to the Board of County Commissioners.

(A) Reasons for denial, refusal or cancellation of permit:

The application shall be granted and the permit shall be issued unless one or more of the following facts is found to exist:

(1) that one or more of the statements in the application is not true;

(2) that the applicant or any agent or representative of the applicant who will participate under the permit is presently or has been engaged in a fraudulent transaction or enterprise, or has been convicted of a felony or other criminal offense involving moral turpitude;

(3) that the expected cost of solicitation will be excessive in relation to the gross amount to be collected. Any such cost of solicitation in excess of twenty-five (25%) per cent of the total amount collected shall be considered and presumed to be unreasonable, but this presumption may be rebutted by Applicant upon good cause shown. Cost of solicitation shall include any money or thing of value not reserved specifically and entirely to assist, aid or further the announced charitable cause. All accounting and bookkeeping records, government reports, all tax records for the preceding two years, and any other relevant papers or documents with reference to the Charitable Solicitation may be examined and audited either at the time of application, during the solicitation, or at or after the expiration of the permit;

(4) when there is good reason to believe that the granting of the permit will result in a direct and immediate danger or hazard to the public security, health, safety or welfare; and

(5) when the applicant or any agent or representative of the applicant who will participate under the permit has previously violated any portion of the Rules and Regulations of the Airport, or has violated any of the terms and provisions of any prior permit or violates this Ordinance.

5. The Director is authorized to only issue two (2) permits for any day.

6. The activities referred to herein shall be conducted strictly in conformity with the terms and conditions of this Ordinance and the permit issued by the Director.

7. The activities referred to herein shall be conducted only in or upon those premises which are non-secured, public use areas. Further, under no circumstances shall the same be conducted:

A. Beyond the security check points through which passengers and visitors are required to pass when moving toward aircraft gate positions; i. e., on the side of the security check points where the gate positions of arriving and departing aircraft are located.

B. In any areas reserved for particular uses, such as parking areas, restroom facilities, restaurants, ticket counters or baggage claim areas;

C. Within ten (10) feet of any area leased exclusively to a tenant of the Airport; or

D. Within thirty (30) feet of any security check point.

E. On Sunday, between 3:00 P.M. and 7:00 P.M., on Monday, between 7:00 A.M. and 10:00 A.M., on Friday, between 3:00 P.M. and 7:00 P.M., and on the following days including three days before and three days after: New Years Day, Easter, Memorial Day, Independence Day, Labor Day, Thanksgiving and Christmas.

8. The term "AREA" as used in Section 9.B.9. hereof with respect to Greater Pittsburgh International Airport, shall mean any one of those areas which are lettered A through E and designated on the floor plan of said Airport which appears on the 5 pages attached hereto, marked Exhibit "A", and fully incorporated herein by reference.

9. In each permit issued by him the Director shall specify, in accordance with the in which the proposed activities by the applicant may be conducted. Solicitations shall be conducted only from "Solicitation Booths" which shall be furnished by the Director and such booth shall be located within the permissible areas at such points as may be designated from time to time by the Director. In addition to all other requirements contained herein, the Director may require that a prominent and conspicuous sign be placed on the Solicitation Booth which sign shall include all of the information required in the application required in Section 9.b.3.

In no event, however, shall more than two persons be engaged in any activities and solicitations permitted by this Ordinance in any one area at the same time. When the Director receives more applications for permits than he is able to grant by following this rule, then he may impose such reasonable and equitable restrictions as to allowable dates or hours or numbers of participants as may reasonably be required to provide fair and as equal as possible opportunities for all applicants, while insuring the efficient and effective operation of the transportation function of the Airport.

10. In conducting the activities described herein, no person shall:

A. In any way obstruct, delay or interfere with the free movements of any other person, seek to coerce or physically disturb any other person, or hamper or impede the conduct of any authorized business at the Airport;

B. Use any sound or voice amplifying apparatus on the premises of the Airport; or

C. Receive or accept any donation of money in place other than from the designated Solicitation Booth.

D. Conduct any other activities in a misleading or fraudulent manner.

11. Any permittees shall wear an identification badge at all times on Airport property which shall contain in a form authorized by Director the following:

A. Name;

B. Address;

C. Telephone Number; and

D. Name of group or organization if any.