Keith McMURDIE et al., Plaintiffs,

v.

Arthur DOUTT, Individually, etc., Defendants.

Civ. A. No. C78–1173Y.

United States District Court, N. D. Ohio, E. D.

April 10, 1979.

Eugene Sidney Bayer, Cleveland, Ohio, for plaintiffs.

Robert C. Neff, Bucyrus Law Director, Bucyrus, Ohio, for Oughwaite.

Phillip S. Arbie, Law Director, Girard, Ohio, for D'Eramo.

Michael F. Cush, Chief Pros. Atty., Massillon, Ohio, for Ross.

Mitchell F. Shaker, Direct of Law, Niles, Ohio, for Doutt.

Don W. Humphrey, Jr., Village Sol., Lisbon, Ohio, for Rudibaugh.

J. Phillip Richley, pro se.

Harold Stein, Edwin Romero, Dept. of Law, Youngstown, Ohio, for Richley.

## MEMORANDUM AND ORDER

WILLIAM K. THOMAS, District Judge.

Pursuant to the Fourteenth Amendment to the United States Constitution, 28 U.S.C. § 1331, 42 U.S.C. § 1983, and 28 U.S.C.

§ 1343(3),[1] plaintiff Keith McMurdie and the Holy Spirit Association for the Unification of World Christianity (hereafter The Unification Church) bring their action "to complain of defendants' prohibition of the Church's religious activity, including solicitation of funds." Alleging that the defendant mayors have barred plaintiffs from the "streets, parks and public places of the cities of which each defendant is mayor," plaintiffs ask that this conduct of the defendant mayors and their application of various ordinances "purporting to regulate plaintiffs' religious activity" be declared unconstitutional and that it be enjoined.

Separate causes of action against certain mayors of northern Ohio cities are joined in the complaint. Some of these claims have been resolved by consent orders and journal entries. The cause of action against defendant Arthur Doutt, Mayor of the City of Niles, is contested, and it has been separately tried. At the conclusion of the testimony taken on Monday, March 19, oral arguments were received. Plaintiffs' claim against the defendant mayor of the City of Niles is ready for decision.

Plaintiff Keith McMurdie testified that he is a lay missionary of The Unification Church and coordinator of legal activities of The Unification Church in the State of Ohio. The evidence indicates that some time in the spring of 1978, plaintiff McMurdie went to the Mayor's office to obtain a permit for The Unification Church to solicit funds in Niles. The Mayor informed him that he would no longer issue permits to The Unification Church. Under section 745 of the Niles Revised Ordinances, no one "shall solicit funds for any purpose whatsoever from the general public of the city without first having procured from the mayor a license therefor."[2]

Defendant Mayor Doutt testified that he had never refused The Unification Church's requests for permits in the years 1976, 1977, and the first two months of 1978.[3] However, in May, he told several representatives of The Unification Church that he would not issue any more permits to The Unification Church because of the harassment of persons being solicited. When one young man cited the First Amendment, the Mayor said that, ". . . I felt that the individual had some rights, too, that they didn't have to put up with harassment or fear," that numerous people had written letters of complaint, and that his job was to protect the City of Niles.

In both granting and in denying solicitation permits to The Unification Church, the Mayor has acted under the authority of section 745. The issue raised in the pleadings and the evidence is whether section 745 is unconstitutional either on its face or as applied to The Unification Church.

## I.

Were this a case in which a commercial solicitor were challenging the constitutionality of the ordinance because of its unlimited and undefined delegation of authority to the mayor to issue permits to peddle wares to the public, it might be necessary to pass on the facial constitutionality of the ordinance.[4] However, the ordinance's dele-

---

1. This court determines that jurisdiction of the subject matter of this case exists under either 28 U.S.C. § 1331 or 28 U.S.C. § 1343(3).

2. Section 745.01 provides:
   No person, firm, corporation or organization shall solicit funds for any purpose whatsoever from the general public of the city without first having procured from the mayor a license therefor and paying the license fee hereinafter proscribed.
   Section 745.02 fixes a license fee of $25; section 745.03 makes the chapter inapplicable to organizations soliciting funds from their own membership; and section 745.04 makes it a

misdemeanor to violate the ordinance, providing a schedule of fines for violations.

3. Received in evidence are copies of mayor's permits for 1976 (four permits), 1977 (three permits), a permit for January 19th–20th 1978 (door-to-door solicitation), and a permit for March 8–24, 1978 (businesses).

4. Although it deals with a different type of ordinance than presented here, *Valentine v. Chrestensen*, 316 U.S. 52, 62 S.Ct. 920, 86 L.Ed. 1262 (1942), upheld a New York statute that prohibited the distribution of any "handbills, circulars . . . or other advertising matter whatsoever in or upon any street"; and *Breard*

gation of authority to the Mayor to grant or withhold solicitation permits is also central to the charge that the ordinance is unconstitutional as it is being applied to the plaintiffs.

The Mayor states that:

> The purpose of a permit is so that we will know who is in the area, and sometimes we request or say that "You will, you know, work this area in such and such an hour" so that we in Niles and the police department know who is in our town.

Were section 745 narrowly construed to conform to the Mayor's stated purpose of the ordinance, then the Mayor would have been required to issue further solicitation permits to The Unification Church. Completing and filing a permit application would fully serve to inform the City of Niles that the designated members of The Unification Church would be in Niles on the dates specified in the permit to conduct their solicitations.

In contrast to the Mayor's verbal construction of the ordinance, the Mayor's actions make clear that he is employing the full discretionary power that the ordinance vests in him. In cutting off solicitation permits for The Unification Church, the mayor is exercising unbridled authority to grant or deny solicitation permits in the City of Niles. The defendant Mayor seeks to justify his denial of permits to The Unification Church by stating that this is necessary to conserve peace in the community. In Part II of this opinion this contention will be considered along with the supporting evidence offered by the defendant. The court now considers the validity of the ordinances as applied to The Unification Church within the context of the testimony of plaintiff Keith McMurdie and the exhibits in evidence.

Can The Unification Church claim a practice of religion protected by the First Amendment? Such a claim is supported by the Church's Articles of Incorporation issued by the State of California, which state that the Church's primary purpose "shall be the worship of God and the study, teachings, and practical application of Divine Principles."

The Internal Revenue Service recognizes that the Church is tax exempt. According to an IRS document dated May 10, 1973, "The Holy Spirit Association for the Unification of World Christianity" has had a tax exemption since 1963.

The practice of religion is revealed in the materials of The Unification Church received in evidence. A bound book entitled *Divine Principle* explains the Church's basic doctrine. The book's general introduction attributes the "Divine Principle" to Sun Myung Moon (the church's founder).[5] The editor's note in *Divine Principle* states that it encompasses "the profound thought of the Orient and based upon Christian beliefs

---

*v. Alexandria*, 341 U.S. 622, 71 S.Ct. 920, 95 L.Ed. 1233 (1951), upheld a conviction for violation of an ordinance prohibiting door-to-door solicitation of magazine subscriptions. More recently, in *Bigelow v. Virginia*, 421 U.S. 809, 819–820, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975), the Court, without expressly overruling *Chrestensen*, held that commercial speech is entitled to some protection under the first amendment.

**5.** The general introduction of *Divine Principle* ends with the following two paragraphs:

> With the fullness of time, God has sent His messenger to resolve the fundamental questions of life and the universe. His name is Sun Myung Moon. For many decades, he wandered in a vast spiritual world in search of the ultimate truth. On this path, he endured suffering unimagined by anyone in human history. God alone will remember it.

> Knowing that no one can find the ultimate truth to save mankind without going through the bitterest of trials, he fought alone against myriads of Satanic forces, both in the spiritual and physical worlds, and finally triumphed over them all. In this way, he came in contact with many saints in Paradise and with Jesus, and thus brought into light all the heavenly secrets through his communion with God.

> The Divine Principle revealed in this book is only part of the new truth. We have recorded here what Sun Myung Moon's disciples have hitherto heard and witnessed. We believe with happy expectation that, as time goes on, deeper parts of the truth will be continually revealed. It is our earnest prayer that the light of truth will quickly fill the earth.

and ideology." The book's topics throw some light on its contents: Part I (Principle of Creation, Fall of Man, Consummation of Human History, Advent of the Messiah, Resurrection, Predestination, and Christology); Part II (Providential Age for the Foundation of Restoration, Providence of Restoration Centering on Moses and Jesus, Formation and Length of Each Age in the History of Providence, Providential Age of Restoration and Age of the Prolongation of Restoration from the Standpoint of Providential Time-Identity, Preparation Period for the Second Advent of the Messiah, Second Advent).[6]

A number of brochures of the Church, also in evidence, are derived from *Divine Principle*. One of these brochures entitled, "Where is God in this World," is given away to people and often used when soliciting according to Mr. McMurdie. The center spread contains a question, "How can anyone believe in God?", and a textual response, another heading, "We can help you find God," and its textual elaboration, and three "Introductory lecture topics." Mr. McMurdie in identifying a pamphlet entitled "Divine Principle—Two Hour Lecture," testified:

> In our church, it is kind of our policy to teach our doctrines by way of lecture series, and this one here is like an introductory type of lecture which would explain kind of generally our theology or our doctrines to someone who is interested. It is kind of an introductory type of lecture.

The Church materials in evidence establish that The Unification Church professes religious principles and the practice of religion. In the course of defendant's cross-examination of Mr. McMurdie, it was brought out that there is no Unification Church in Niles, the closest being in Hudson, Ohio. Defendants' cross-examination of Mr. McMurdie in this and other ways sought to question the genuineness of The Unification Church and its founder, Reverend Sun Myung Moon. That issue is not material to these proceedings.

The truth of religious representations may not be challenged, the Supreme Court held in *United States v. Ballard,* 322 U.S. 78, 64 S.Ct. 882, 88 L.Ed. 1148 (1944). Ballard was convicted under an indictment that "charged a scheme to defraud by organizing and promoting the I Am movement through the use of the mails." On appeal, the court of appeals held that the question of the truth of the representations concerning respondents' religious doctrines or beliefs should have been submitted to the jury. In reversing the court of appeals and in remanding the case for consideration of further grounds of error, the Supreme Court concluded that the district court "ruled properly when it withheld from the jury all questions concerning the truth or falsity of the religious beliefs or doctrines of respondents." Among other things, the opinion of Justice Douglas stated:

> Men may believe what they cannot prove. They may not be put to the proof of their religious doctrines or beliefs. Religious experiences which are as real as life to some may be incomprehensible to others. Yet the fact that they may be beyond the ken of mortals does not mean that they can be made suspect before the law.

*Ballard, supra* at 86–87, 64 S.Ct. at 886. In *United States v. Seeger,* 380 U.S. 163, 184, 85 S.Ct. 850, 863, 13 L.Ed.2d 733 (1965), the Court considered the appeal of a criminal

---

**6.** The final section of *Divine Principle* entitled "Second Advent" concludes with this paragraph: .

> Nothing could be more miserable than the fact that we, as the same offspring from the same parents, having the common feelings of joy and anger, cannot share them with one another because of the difference in the languages which express them. Therefore, in order that the ideal world of one great family, under the Lord of the Second Advent as the True Parent, might be realized, all the languages must necessarily be unified. Since the language was confused due to the tower of Babel exalting the will of Satan, the languages of all nations must now be unified, according to the principle of restoration by indemnity, centering on the Heavenly tower, and exalt the will of God. In this way, the whole of mankind will become one people speaking one language, thus establishing one world of one culture.

conviction under the Universal Military Training and Service Act involving a claim that the defendant was exempt as a conscientious objector, and held:

> The validity of what he believes cannot be questioned. Some theologians, and indeed some examiners, might be tempted to question the existence of the registrant's "Supreme Being" or the truth of his concepts. But these are inquiries foreclosed to Government.[7]

Here also inquiries into the validity of "The Divine Principle," and the religion which is professed and practiced by Rev. Sun Myung Moon and his followers are foreclosed.

The Mayor was asked if anyone came into Niles to preach for The Unification Church and he answered, "No, just to sell flowers and candy." The Mayor appears to be drawing a distinction between The Unification Church's preaching which would be protected by the First Amendment and the offering of candy and flowers by The Unification Church which he apparently believes is not protected by the First Amendment. The Mayor's differentiation will be examined in light of Mr. McMurdie's testimony.

Lay missionary McMurdie described his own solicitation in December, 1977 and January, 1978. He visited businesses, going from shop to shop. He had some candy which he gave away. He asked shop owners if they would donate. He explained his name. If the party was interested, he would explain about the Church. He asked for a dollar or two. He stated that the funds solicited go to the Church, but it is evident that he does not regard solicitation solely as a means of obtaining monies for the support of the Church. He said that in soliciting funds in Niles, "our purpose is twofold. First of all to introduce people to our church and also to solicit funds." He said that he wished to "continue proselytizing," i. e., to gain new converts for the Church. He summed it up by saying, "[W]e are not selling anything . . . our soliciting is a religious practice." The Unification Church National Policy on Fund Raising, as quoted in the margin,[8] authoritatively corroborates Mr. McMurdie's testimony that "we are not selling anything."

The court accepts the policy statement and determines that it is the policy of the Church that "no product used in connection with solicitation of contributions may be offered for sale." While Mr. McMurdie additionally testified that the Church's "soliciting is a religious practice," this point is not developed in the record. Hence, on the present record this court cannot conclude as courts have in the Hare Krishna cases [9] that

7. *Seeger, supra,* at 185, 85 S.Ct. at 863, further held:
   But we hasten to emphasize that while the "truth" of a belief is not open to question, there remains the significant question whether it is "truly held." This is the threshold question of sincerity which must be resolved in every case. It is, of course, a question of fact—a prime consideration to the validity of every claim for exemption as a conscientious objector.
   McCurdie's testimony and demeanor convinces this court of his sincerity.

8. Since we are not selling items, but asking for donations, two words that create a wrong impression are "buying" and "selling". The use of these two words imply that our solicitation is of a commercial or marketing nature. Funds solicited are strictly on a donation basis and a distinction must be made between the two concepts. The easiest way to phrase the amount we would like to receive as a donation is, "Most folks help with one dollar," or, "Most everybody gives one dollar."

Remember that no product used in connection with solicitation of contributions may be offered for sale. The product must be made available to all those willing to listen to your witnessing on the teachings and activities of the Church, whether or not a contribution is actually made.

9. *See, e. g., Intern. Soc. For Krishna Cons. of W. Pa., Inc. v. Griffin,* 437 F.Supp. 666, 669 (W.D.Pa.1977):
   [Based on Hinduism, the Krishna Consciousness] imposes upon its followers the obligation to perform a religious ritual known as Sankirtan, which requires disseminating and selling of religious publications and soliciting contributions in public places. Sankirtan is directed to spreading ISKCON's [International Society for Krishna Consciousness] religious beliefs, attracting new followers, and financially supporting their religious activities.
   The court concluded that ISKCON's literature distribution and fund solicitations are motivated by their religion and constitute a form of

members of The Unification Church are under an obligation to disseminate religious publications and solicit contributions in public places.

■ Taking into consideration the evidence in this record, it is concluded and determined that when members of The Unification Church engage in solicitations as described by Mr. McMurdie, and when the product (candy, flowers, or religious materials) is "made available to all those willing to listen" to a solicitor's "witnessing on the teachings and activities of the Church, whether or not a contribution is actually made," solicitation is a religious practice of the Church that is protected by the First Amendment.

■ Deciding on this record that the Church's solicitation is protected by the First Amendment, the Mayor's refusal to grant further solicitation permits to The Unification Church deprives The Unification Church and its members of "the free exercise of the chosen form of religion"[10] safeguarded by the First Amendment, made applicable to the States (including municipalities) by the Fourteenth Amendment. *Cantwell v. Connecticut, supra.* In *Cantwell* the court considered the constitutionality of a Connecticut law that conditioned religious solicitation upon issuance of a certificate by the secretary of the state public welfare council who was empowered to "determine whether the cause is a religious one."

> If he finds that the cause is not that of religion, to solicit for it becomes a crime. He is not to issue a certificate as a matter of course. His decision to issue or refuse it involves appraisal of facts, the exercise of judgment, and the formation of an opinion. He is authorized to withhold his approval if he determines that the cause is not a religious one.

*Cantwell, supra,* at 305, 60 S.Ct. at 904. Similarly, section 745 authorizes the Mayor to exercise unbridled discretion in deciding what "person, firm, corporation or organization shall be granted a license to 'solicit funds . . . from the general public of the city'." The Mayor is applying this ordinance to The Unification Church to cut off the right of The Unification Church and its members to solicit funds while proselytizing. The ordinance thus authorizes, and the Mayor is engaging in, religious censorship in violation of the First Amendment. The censorship is no less because the Mayor says that there would be no interference with The Unification Church if representatives of the Church sought to preach in Niles. The Church is also entitled to engage in soliciting funds while proselytizing as that practice is described by witness McMurdie.

## II.

Asked on cross-examination if he ever told anyone that persons have a right to solicit under the First Amendment, the Mayor answered, "To me it is not a question of religion. It is a question of harassment." In support of this assessment, defendant offered the testimony of several persons.

Two women testified of similar experiences in supermarket parking lots. One witness testified that as she was getting out of her car at the supermarket, a young man

First Amendment expression. Similarly, see, *ISKCON v. Engelhardt,* 425 F.Supp. 176, 178 (W.D.Mo.1977).

**10.** Justice Roberts' opinion in *Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940), declares:

> The fundamental concept of liberty embodied in [the Fourteenth] Amendment embraces the liberties guaranteed by the First Amendment. The First Amendment declares that Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof. The Fourteenth Amendment has rendered the legislatures of the states as incompetent as Congress to enact such laws. The constitutional inhibition of legislation on the subject of religion has a double aspect. On the one hand, it forestalls compulsion by law of the acceptance of any creed or the practice of any form of worship. Freedom of conscience and freedom to adhere to such religious organization or form of worship as the individual may choose cannot be restricted by law. On the other hand, it safeguards the free exercise of the chosen form of religion. Thus the Amendment embraces two concepts, freedom to believe and freedom to act. [Footnote omitted.]

walked up to her and asked if she wanted to buy candy. She responded by asking who he was but received no answer. She testified that then:

I said, "well, who are you selling the candy for? Why are you selling it?"

And he told me it was to raise money for crippled children.

And I asked who the group was they were selling it for again and he didn't tell me.

\*   \*   \*   \*   \*   \*

And I asked if he was from the Unification Church, and he mumbled around a little bit, lowering his voice.

And I said, "I couldn't hear you."

And he said, "Well, yes, I am. So what?"

And I said, well, I was sorry, I didn't want to contribute.

And he said, "Well, don't you believe in God? Don't you want to help other people?"

She further testified that then:

I said, "I imagine your folks believe in God, too," and I said, "They're probably wondering how you are doing. Have you spoken to your folks recently?"

And the next thing I knew I had his finger in my face and he was yelling at me, "You're one of them. You're one of them."

And I said, "What?"

And he kept waving his finger in my face and speaking louder and louder. He said I was one of Satan's workers and to get away from him.

The witness stated that the incident embarrassed her.[11]

Another witness, a businessman, whose place of business includes both a front sales counter area and a machine shop in the rear, described several incidents involving solicitors from The Unification Church. In the spring of 1977 he occasionally bought candy or candles from solicitors until they solicited "much more frequently." These initial solicitors did not identify themselves. (Subsequently, the solicitors started to wear badges.) After being asked if he would be interested in donating to their church, he "found out that they were Moonies" and "threw that at them" the next time they came in. He said that solicitors would interrupt him as he waited on customers and they would solicit waiting customers—practices he asked them to stop.

On one occasion, after stating he was not interested in buying candy and asking the solicitor to leave, the person did not leave but rather solicited two of his employees. A young counter man "offered them 50 cents, and they wouldn't take it. They said it was $2 for the box of candy."[12] He told them "to get out." Upon leaving the front of the store, he noticed that upon leaving the front door, the solicitors turned as though to enter the rear machine shop. Upon investigation he discovered that they had ignored a 3' × 4' sign stating, "Positively No Admittance Due to Insurance Regulations" and entered the shop. He testified that the machine stop is a dangerous area as it contains "large lathes, bonding items, drum lathes," and a 3500 r. p. m.

11. The other witness testified that as she got out of her car, a young woman came up to her trying to place a flower on her. When the young woman was asked what church she represented, the witness got no response; and she saw no badge or identification. She testified that then:

I said, "Is this the Reverend Moon's church, Unification Church?"

She didn't answer me then either. So she continued trying to put the flower on.

I didn't want the flower. So I started to walk away. And I said, "If it's for his church, I don't believe in it."

And she said, "Oh, you don't believe in God, then?"

I said, "Yes, I believe in God, but I don't believe in him."

It is not certain that the solicitor was a Unification Church solicitor. Thus, on cross-examination the witness was asked, "[A]re you sure you know which religion this person represented?", and she answered, "Well, she didn't answer me when I asked her."

12. This conduct directly contravened the Church's Fund Raising Policy (n. 8) that "[t]he product must be made available to all those willing to listen to your witnessing . . . whether or not a contribution is actually made."

grinding stone that "has exploded in the past." They were soliciting the shop foreman who was running a lathe at the time. He "quite strongly" asked them to leave—"not in the polite language of the Court." [13]

Two housewives described visits of solicitors to their homes. The first of these described the request that was made of her by one of two young people to contribute to a missionary fund. The solicitor offered no identification. The housewife testified:

I rather pushed him, and he told me then it was the Church of the Unification.

I said, well, I wouldn't really care to contribute because I didn't agree with some of their principles.

And he said, "Oh? What do you know about it?

And I said, "Oh, I have been reading quite a bit about it."

And he said, "What don't you agree with?"

And I said, "Who do you believe the Messiah is?"

And he said, "Oh, anyone can be the Messiah."

And I said, "Well, I don't happen to agree with that," and I said, "I don't care to contribute."

However, this did not end the conversation, she indicated.

[H]e pushed me a little bit, and I said, "I'm glad we live in a country where we can each have our own beliefs. But I don't really care to contribute to this."

And with that he became very agitated, became very loud, and he said something to the effect that "You and people like you just better get concerned." He said, "If you knew what our country was doing in other parts of the world and if you knew what was going on in the school down in Niles—I went there," he said, "and if you knew what was happening down there now, you would get concerned."

And he started to back off and he shook his finger in my face and I closed the door. [14]

Two Niles policemen testified. One testified that he received complaints of solicitors harassing persons in front of a supermarket. When he approached, he was told they were with The Unification Church; and they said they were soliciting funds. They were soliciting after six o'clock which is not permitted. On a second occasion he ob-

13. When asked whether he would consider it proper for persons to enter into dangerous areas of a business, Legal Coordinator McMurdie answered, "I would say that is not proper." Among the provisions of "The Unification Church National Policy on Fundraising" it is stated:

(4) All members must clearly display official Unification Church Identification Cards on their outer garment.

\* \* \* \* \* \*

(5) All municipal regulations pertaining to the solicitation of funds, i. e., time or place, must be followed, and all rights of private property respected.

14. The other housewife testified that a solicitor tried to sell her candy at her home while she had guests. She stated:

And I said, "Well, no. I just don't want to be bothered." And I said, "Well, for whom are you selling this candy?"

And he just did not answer me. He just said—no, he did answer me. He said, "Well, does that make any difference?"

This same witness testified about a young man in a wheelchair selling candy outside the post office in Niles; she stated:

But anyway, I went into the Post Office, and when I came out you really had to be in front of him because of the way he was—had himself parked there.

And he said, "Won't you buy some candy?"

And I said, "No, not today."

So he just took hold of my arm and said, "Well, now, just a minute."

And so I said, "No, I don't care for any."

And he said, "Just one box."

And I said, "No."

And he said—and I said to him, "Well, for whom are you selling this candy?"

And he did say, "The Unification Church" then.

But I just walked away then. I did say to him, "Well, you know I love you, but I'm not very fond of what you or your church represents."

She said she wrote a note to the Mayor "object[ing] to any solicitor who does things in an uncommon manner." Asked what "uncommon" means, she replied, "Well, I have never seen anyone soliciting in front of the Post Office in that manner, taking up that much space and being so insistent upon selling you something."

served soliciting at a busy intersection (State Route 46 and U.S. Route 422). Seeing a commotion, he observed two solicitors in the intersection, one in front of a car and one at the side of a car. He advised them they weren't allowed to be there.

On yet another occasion—late in the evening—he answered a complaint of soliciting inside a nursing home. He brought the solicitor to the police station only to receive a call of another solicitor at the nursing home. On returning, he found this solicitor inside a utility room. He also was from The Unification Church, and he was brought to the police station. The solicitors were charged with soliciting after hours (after six o'clock p. m.). Each posted a recognizance bond of $25.00 which was later forfeited.[15]

Harassment of Niles citizens by The Unification Church solicitors, which defendant says is proved by the testimony of these defense witnesses, is the Mayor's justification for cutting off solicitation permits to The Unification Church. Harassment is defined by 39 C.J.S., p. 774 as an "[a]ct or instance of harassing, or state of being harassed; hence annoyance, anxiety or worry." The testimony of the four housewives and the businessman showed that they were obviously annoyed. The testimony of the two housewives who were suddenly confronted by solicitors in the supermarket parking lot as they were alighting from their cars reflected their anxiety. Anxiety was evident also in the testimony of the lady who locked her home screen door during her conversation with a solicitor. Worry or fear was undoubtedly in the mind of the lady described by the Mayor who left the parking lot because she was afraid to get out of the car.

The conduct of Unification Church solicitors, to the extent of the excesses described by the defendant's witnesses, does not conform to the solicitation methods that lay missionary McMurdie says he used in Niles nor to the stated solicitation policy of The Unification Church. These excesses may justify the City of Niles in enacting lawful remedies.[16] Yet these described excesses cannot legalize or save section 745's invalid delegation to the Mayor of unbridled authority to grant or deny solicitation permits, or the Mayor's unlawful exercise of that authority in completely cutting off The Unification Church's First Amendment rights to secure solicitation permits. The constitutionality of the ordinance is, indeed, a "question of religion," harking back to the Mayor's words. However, to the extent instances of actual harassment may be legally remedied, the City is free to take such steps.

*Cantwell v. Connecticut, supra,* makes it clear that:

[A] State may by general and non-discriminatory legislation regulate the times, the places, and the manner of soliciting upon its streets, and of holding meetings thereon; and may in other respects safeguard the peace, good order and comfort of the community, without unconstitutionally invading the liberties protected by the Fourteenth Amendment.

*Id.* at 304, 60 S.Ct. at 903. At a later point in the opinion, the Court declared:

Nothing we have said is intended even remotely to imply that, under the cloak of religion, persons may with impunity, commit frauds upon the public. Certainly

---

**15.** The second police officer testified that he was called to a shopping mall to answer complaints of solicitation. He saw solicitors blocking traffic and grabbing people by the arm. He learned that they had permits and did not arrest. He said that although they were upsetting people, he did not think they were in violation of the criminal law and did not arrest them. On another occasion, two persons were arrested for soliciting in the same East Mall parking lot after hours. Each posted a $25.00 bond which was later forfeited.

**16.** *Hynes v. Mayor of Oradell,* 425 U.S. 610, 617, 96 S.Ct. 1755, 1759, 48 L.Ed.2d 243 (1976), recognizes:

. . . a municipality's power to protect its citizens from crime and undue annoyance by regulating soliciting and canvassing. A narrowly drawn ordinance, that does not vest in municipal officials the undefined power to determine what messages residents will hear, may serve these important interests without running afoul of the First Amendment.

penal laws are available to punish such conduct. Even the exercise of religion may be at some slight inconvenience in order that the State may protect its citizens from injury. Without doubt a State may protect its citizens from fraudulent solicitation by requiring a stranger in the community, before permitting him publicly to solicit funds for any purpose, to establish his identity and his authority to act for the cause which he purports to represent. The State is likewise free to regulate the time and manner of solicitation generally, in the interest of public safety, peace, comfort or convenience. [Footnote omitted.]

*Id.* at 306, 307, 60 S.Ct. at 904.

▆ Niles has fixed solicitation hours as 9:00 a. m. to 6:00 p. m. This restriction falls within "the time . . . of solicitation" regulation approved by *Cantwell.* The Niles police officers reported arrests (and forfeited recognizance bonds) of several Unification Church solicitors who solicited after hours. Sanctions in a solicitation ordinance, directed at repeat violators, might, in addition to a fine, provide for suspension of the right of the repeat violator to apply for a solicitation permit for a reasonable period.

▆ Several Niles witnesses indicated lack of identification badges on solicitors and resistance on the part of solicitors to acknowledge that they were Unification Church solicitors. *Cantwell* makes clear that establishment of identity can be required of solicitors. Intentional refusals by solicitors to identify themselves could be made a ground for suspension of the solicitor's license.

▆ Suspension of the license of an individual solicitor of a religious organization, however, does not warrant denial of the right of a religious organization to qualify other solicitors. It is the Mayor's total cut-off of the right of The Unification Church to qualify any solicitors because of the allegedly offensive conduct of some solicitors that violates the First Amendment rights of The Unification Church and its members.

*Cantwell* upholds a State's right by "general and nondiscriminatory legislation 'to regulate' the places and the manner of soliciting upon its streets." Judicial notice is taken that persons are accosted, assaulted, or robbed as they leave or enter automobiles parked in shopping centers and other parking lots. It is against this background that one must appraise the anxiety and fright exhibited by the women who each testified that she was suddenly confronted by a Unification Church solicitor as she was alighting from her automobile.

A shopping center's sidewalks, streets, and parking areas, although open to the public by the private owner (so long as they are not part of a company town in which the owner is "performing the full spectrum of municipal powers," *Marsh v. Alabama,* 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946)), may be subjected to nondiscriminatory bans on expression without running afoul of the First Amendment. *See Hudgens v. NLRB,* 424 U.S. 507, 521, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976); *Lloyd Corp. v. Tanner,* 407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1972). Hence, it is concluded that municipal legislation intended to prevent solicitation confrontations in shopping center parking lots, provided the legislation is general in character and nondiscriminatory in operation, would not run afoul of the First Amendment.

Several witnesses testified that a solicitor attempted to pin a flower on them, laid a hand on their person, or stuck a finger close to their face. Narrowly drawn language in a solicitation ordinance might make such conduct a ground for suspension of a solicitor's license.[17]

---

17. In *International Soc. for Krishna Consciousness of W. Pa., Inc. v. Griffin, supra,* at 673, Judge Teitelbaum thus dealt with a similar complaint directed at Krishna solicitors:

This Court is aware of a practice by ISKCON members whereby the solicitor will pin a flower on the prospective donor without his consent and prior to any indication that the

Given the controversial nature of The Unification Church and Reverend Sun Myung Moon, confrontations between solicitors of The Unification Church and unwilling or uninterested solicitees are predictable. Certainly the number and acerbity of these tete-a-tetes will be diminished if the solicitors obey their "Fundraising Policy" instruction:

> Overaggressiveness, rudeness or use of high pressure tactics are strictly forbidden, in accordance with our religious teachings.

The Mayor stressed his role as conservator of the peace. He said, "My job is to protect, I think, the City of Niles as well as anything else. I think it is one of my great responsibilities, to keep people from fear. There are places I understand where they are afraid to go downtown at night. Well, this is not going to be Niles, in my estimation."

The Mayor's conscientious devotion to his responsibilities is commendable. In the exercise of his discretion, and in the discretion accorded him by city ordinance, he must, of course, also honor and enforce the United States Constitution, which he is sworn to uphold.

As applied to the plaintiff Unification Church and its members, including plaintiff McMurdie, section 745 of the Niles revised Ordinances is declared to be unconstitutional and therefore invalid. Defendant and the City of Niles is enjoined from enforcing the ordinance as to said plaintiffs.

IT IS SO ORDERED.

prospective donor wishes to make a contribution. As a result, there have been altercations arising out of ISKCON's attempted solicitation of funds. Defendants have taken the position that these assault and battery matters are private actions and the assaulted person should be required to file a complaint before the local magistrate. Defendants' position is untenable because it ignores the realities of human behavior. Almost all travelers will elect to forego filing a complaint for an assault, which although it represents a continuing course of harassing conduct vis a vis the airport travelers, is minor in stature. Ratification of defendants' view would in effect sanction ISKCON's conduct and leave the transient group of airline passengers without a practical remedy. Accordingly, the December 2, 1975 Order of Court is hereby amended to include a provision prohibiting any physical contact by the ISKCON follower with the prospective donor unless said donor has either consented or already agreed to make a contribution.