INTERNATIONAL SOCIETY FOR KRISHNA CONSCIOUSNESS and Bill Glick on Behalf of all Members of the International Society for Krishna Consciousness

v.

STATE FAIR OF TEXAS, a Nonprofit Corporation, Wayne Gallagher, Executive Vice President and General Manager of the State Fair of Texas, George Schrader, City Manager of Dallas, Texas, Donald Byrd, Police Chief of Dallas, Texas, and Jack W. Robinson, Director of the Department of Parks and Recreation of the City of Dallas, Texas, and the City of Dallas.

Civ. A. No. CA–3–78–1279–G.

United States District Court,
N. D. Texas,
Dallas Division.

Oct. 18, 1978.

---

John F. Jordan of Jordan, Rubin & Pace, Dallas, Tex., for plaintiffs.

Joe G. Werner, Asst. City Atty., Dallas, Tex., for defendant City of Dallas.

Russell B. Smith, Dallas, Tex., for defendants State Fair of Texas and Wayne Gallagher.

## MEMORANDUM ORDER

PATRICK E. HIGGINBOTHAM, District Judge.

The State Fair has a day for school children, teachers, farmers, and others. It is, I suppose, in keeping with the times that October 17th is Federal Judges Day.

The International Society for Krishna Consciousness (ISKCON) asks this court to stop City of Dallas police officers, the State Fair of Texas, a nonprofit corporation, and others from interfering with their soliciting of funds and proselytizing of converts at the State Fair.

This court has described both ISKCON makeup and activity in other cases and will not burden this order with its repetitions.[1]

The ISKCON members are engaging in essentially the same activities at the State Fair as they were at the Civic Center.

Upwards of three million people attend the fair held annually on a tract of approximately 250 acres located near downtown Dallas. That the State Fair is a public forum is not disputed. And as this court noted in its "Civic Center" opinion:

> ISKCON's activity in a public forum would indisputedly be protected by the First Amendment. *Memorandum Opinion*, May 5, 1978.

The rub comes from the assertion by State Fair officials that the solicitations are being made in an illegal manner. ISKCON devotees allegedly refuse to make change, take advantage of children and retarded persons, and misrepresent their purpose to persons solicited. Numerous complaints have been received. Responding to these complaints, State Fair officials on Saturday, October 14, 1978, requested the Dallas police to escort from the fair grounds per-

---

1. *See International Society for Krishna Consciousness et al. v. Schrader, City Manager of Dallas, Texas, et al. and Barshop, Director of Dallas Convention Center*, D.C., 461 F.Supp. 714.

sons soliciting away from their designated booths or locations. This was the first time that the State Fair had taken this position although all exhibitors are to execute a standard form lease that provides in paragraph 14:

14. Lessee-Exhibitor's personnel shall restrict their solicitations and demonstration efforts at all times to the area within the contract space.

The exhibitors include some eight religious groups as well as the county Republican and Democratic Parties, all operating under the State Fair's form lease that forbids solicitation away from a lessee's booth. The State Fair stands ready to make a booth in a prominent place available to ISKCON under the same rules as all "exhibitors."

ISKCON devotees argue, however, that they cannot effectively carry out their mission if confined to a booth; they argue that a booth would not allow them to seek out a person and engage him in discussion (and solicit him). The reply is that the confinement to booth requirement is not aimed at ISKCON's protected activity but is uniformly applied to achieve a government goal of orderly administration.

In order to determine whether the challenged restriction is valid, this court must answer the following questions:

1. May the state exert any control over activities at the Fair, that is, may any restrictions be placed on solicitors?

2. If so, do the same restrictions apply to ISKCON as to all other solicitors?

■■■ A fair is almost by definition a congeries of hawkers, vendors of wares and services, and purveyors of ideas, commercial, esthetic, and intellectual. The crowds are not captive but move freely to those places and booths they choose. True, the Fair's passageways and grounds are a public forum; yet this does not mean that the Fair functions without restrictions. Even religious practices and speeches occurring in a public forum are subject to a test of time, place, and manner balancing. That is, recognition that the fair grounds are a public forum does not mean that the activities of ISKCON and all other solicitors cannot be subjected to reasonable time, place, and manner restrictions. Those restrictions, however, must be nondiscriminatorily administered and may not be premised on censorship of the message which protected speech or conduct conveys. This is true whether the rights have their genesis in the belief or speech values of the First Amendment. Consider the following language of the Supreme Court first as to speech and second as to belief:

*Schneider v. State*, 308 U.S. 147, 160–161, 60 S.Ct. 146, 150, 84 L.Ed. 155:

"Municipal authorities, as trustees for the public, have the duty to keep their communities' streets open and available for movement of people and property, the primary purpose to which the streets are dedicated. So long as legislation to this end does not abridge the constitutional liberty of one rightfully upon the street to impart information through speech or the distribution of literature, it may lawfully regulate the conduct of those using the streets. For example, a person could not exercise this liberty by taking his stand in the middle of a crowded street, contrary to traffic regulations, and maintain his position to the stoppage of all traffic; a group of distributors could not insist upon a constitutional right to form a cordon across the street and to allow no pedestrian to pass who did not accept a tendered leaflet; nor does the guarantee of freedom of speech or of the press deprive a municipality of power to enact regulations against throwing literature broadcast in the streets. Prohibition of such conduct would not abridge the constitutional liberty since such activity bears no necessary relationship to the freedom to speak, write, print or distribute information or opinion."

*Cantwell v. Connecticut*, 310 U.S. 296, 306–307, 60 S.Ct. 900, 84 L.Ed. 1213:

"Civil liberties, as guaranteed by the Constitution, imply the existence of an organized society maintaining public order without which liberty itself would be lost in the excesses of unrestrained abuses. The authority of a municipality to impose regulations in order to assure the safety and convenience of the people in the use of public highways has never been regarded as inconsistent with civil liberties but rather as one of the means of safeguarding the good order upon which they ultimately depend. The control of travel on the streets of cities is the most familiar illustration of this recognition of social need. Where a restriction of the use of highways in that relation is designed to promote the public convenience in the interest of all, it cannot be disregarded by the attempted exercise of some civil right which in other circumstances would be entitled to protection. One would not be justified in ignoring the familiar red traffic light because he thought it his religious duty to disobey the municipal command or sought by that means to direct public attention to an announcement of his opinions." *Cox v. New Hampshire*, 312 U.S. 569, 574, 61 S.Ct. 762, 765, 85 L.Ed. 1049.

There would be no fair without some control of the place of the vendors' locations. With thousands of vendors and hundreds of thousands of potential purchasers, control is central. ISKCON suggested in argument that its rights are different from the other vendors and that voiding the requirement that all solicitors remain in booths as to its devotees would not free other State Fair's lessees. The argument is premised on the continued vitality of the doctrine that commercial speech has little if any First Amendment protection. That idea found substantial support in several decisions of the Supreme Court. *See, e. g., Valentine v. Chrestensen*, 316 U.S. 52, 54–55, 62 S.Ct. 920, 86 L.Ed. 1262 (1942); *Breard v. Alexandria*, 341 U.S. 622, 71 S.Ct. 920, 95 L.Ed. 1233 (1951). This exception for commercial speech has, however, fallen before recent Supreme Court decisions.

*See Bigelow v. Virginia*, 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975); *Va. Pharmacy Bd. v. Va. Consumer Council*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). In the latter case the Court observed:

> Last Term, in Bigelow . . . the notion of unprotected "commercial speech" all but passed from the scene. . . . *Id.* at 759, 96 S.Ct. at 1824.

Yet the demise of the doctrine did not necessarily place commercial speech on a parity with other forms. The Court by a footnote dropped a caveat in *Va. Pharmacy Bd. v. Va. Consumer Council*:

> In concluding that commercial speech enjoys First Amendment protection, we have not held that it is wholly undifferentiable from other forms. There are commonsense differences between speech that does "no more than propose a commercial transaction," *Pittsburgh Press Co. v. Human Relations Comm'n*, 413 U.S. [376], at 385 [93 S.Ct. 2553, 37 L.Ed.2d 669], and other varieties. 425 U.S. at 771 n.24, 96 S.Ct. at 1830.

### Place Restriction

When a rule is evenly applied to both commercial and other protected conduct but results in markedly different impacts, the rule may be valid as to one but invalid as to the other. Differing results here are the product—not of discriminatory application or a grading of protections, but is instead inherent in a conscientious application of a weighing of government's needs for the rule against loss of right.

As noted, ISKCON here asserts rights that have their genesis both in belief and speech protection of the First Amendment. That there is a commercial side does not alter its religious character. As the Supreme Court stated in *Murdock v. Pennsylvania*, 319 U.S. 105, 111, 63 S.Ct. 870, 87 L.Ed. 1292 (1943):

> [T]he mere fact that the religious literature is *"sold"* by itinerant preachers rather than *"donated"* does not trans-

form evangelism into a commercial enterprise. If it did, then the passing of a collection plate in church would make the church service a commercial project. . . It should be remembered that the pamphlets of Thomas Paine were not distributed free of charge. It is plain that a religious organization needs funds to remain a going concern. . . . Freedom of speech, freedom of the press, freedom of religion are available to all, not merely to those who can pay their own way. *Id.* at 111, 63 S.Ct. at 874. (Emphasis added).

In order to understand the impact of the place restriction on ISKCON, it is necessary to appreciate the nature of that religion. The devotees of this sect of hinduism carry a duty to perform an evangelical ritual called "Sankirtan." It consists of spreading the "truth" and soliciting. The donations and book sales are the lifeblood of the temple, providing sole support for its temple and members. It involves a one-to-one exchange. It cannot be exercised from a 30-foot booth with any degree of effectiveness—not when the fair grounds sprawl over approximately 250 acres. The inescapable fact is that the impact of the booth restriction upon the protected activities of ISKCON devotees is markedly different from its impact on other commercial vendors. Accordingly, a true balancing of interests requires a correspondingly greater justification for the place restriction. If the restriction as to place would be valid as to most other State Fair Lessees who lack similarly unique interests, the primary justification (controlling vendor location to avoid chaos) for the place restriction is absent. The State Fair's remaining justification for the place restriction is the need to prevent misrepresentation in the Krishna solicitation efforts. The State Fair has an understandable interest in policing all conduct for violations of state criminal laws. The evidence suggests that it is doing so with vigor. The place restriction, however, is not so tailored to the problem as to justify this restraint. This legitimate concern with preventing fraud and theft can-

not justify a rule which prohibits all devotees from practicing Sankirtan in a public forum. It would be a specie of prior restraint and would require strong justification.

Nothing remains by way of government justification to outweigh the heavy impact of *this* blanket place restriction upon ISKCON. It must fall. That is not to say that some other place restriction might not be valid. Solicitation ought not occur, for example, where fair goers cannot walk away. As this court has written:

> . . . ISKCON is not entitled to a place of confrontation where its audience cannot escape. That is, ISKCON is not entitled to a captive audience, only access. *ISKCON et al. v. Schrader et al.*

### A Valid Place and Manner Restriction: Reweighing Sankirtan as Actually Practiced

The Krishnas have a very distinct dress and appearance. They shave their heads, leaving only a small ponytail and wear loose-fitting clothing of an Indian style. They appear in this conspicuous dress on the streets with their now familiar chants. The change in the manner of their dress when soliciting at the fair is troubling. When these same persons, so obviously demonstrative in their faith, wish to solicit money at the fair, they don wigs and ordinary street clothes presumably to conceal their identity. Moreover, the devotees do not reveal the Krishna membership to persons solicited unless asked. Even then the persons are only told that they are affiliated with "ISKCON;" Krishna is not mentioned. Moreover, many of the devotees engaged in soliciting distribute no literature but hand out a flower, piece of candy or a small flag for which they seek a donation. The temple president explained that the "gift" avoids the immediate negative reaction of a person who is asked to contribute. This practice is rife with potential fraud. Moreover, it is difficult to understand how any proselytizing can occur when the advo-

cate studiously avoids disclosure of even his membership in ISKCON. There is little reason to go in disguise except to deceive. ISKCON replies that people will not give so readily if they are identified as Krishnas. This is more confession than justification.

The sum of the Krishnas' claim is that they want the anonymity of the commercial vendor but the protection of the free exercise clause of the First Amendment. As noted in the preceding analysis, the place restriction as to the Krishnas may have a differing impact upon the Krishnas *because* they are engaged in more than protected commercial speech in that they were discharging a religious duty as well as proselytizing for converts. When, however, they do no more than ask for money in exchange for "gifts" of candy or flowers, not only with no effort to engage in protected discussion but with an affirmative effort to avoid it, their rights are not sufficiently differentiable from those of other commercial vendors as to avoid the place restriction. It follows that the right to rove free of the place restriction exists only for those engaged in solicitation pleas and without the disguise of clothing worn only to mislead. Otherwise stated, solicitation alone with no distribution of literature and no disclosure of purpose, although the funds may flow to the temple and although there may be religious belief that the funds be solicited, is not sufficiently different from protected commercial speech as to avoid the place restriction. The impact of the place restriction upon Sankirtan is simply to reduce the amount of the solicitations obtainable. The same may be true for a great number of the vendors. This analytical construct is consistent with that posed by Justice Frankfurter in *Niemotko v. Maryland*, 340 U.S. 268, 282, 71 S.Ct. 325, 95 L.Ed. 267 (1951). It considers the interest to be protected and the methods of restraint, in the time, place, and manner context.

In sum, the Krishnas may openly practice their "Sankirtan" without place restriction.

But if they are to go in disguise and "give away" flowers with no distribution of literature or disclosure of purpose, they must obtain a booth.

### Conclusion

This is a difficult case. There is strong evidence that although most of the Krishna are sincere in their convictions, some are misrepresenting to fair goers their status and purpose. And evidence that a retarded child from a state home is relieved of his money during his visit to the fair—in the name of a religion—causes the most meek of us to bristle. Yet the evidence is not complete on all incidents and the complaints voiced against them do come from a hostile audience. More importantly, when we respond we must do so within the limits of our Constitution. We pay many short-run prices for that adherence, but they are necessary to the vigor of a society devoted to civil liberty. Inevitably in free speech and religion contexts there are tensions and inconvenience and irritation. I think it wise to keep the words of Justice Black in mind:

> I do not believe that it can be too often repeated that the freedoms of speech, press, petition and assembly guaranteed by the First Amendment must be accorded to the ideas we hate or sooner or later they will be denied to the ideas we cherish. *Communist Party of the United States v. Subversive Activities Control Board*, 367 U.S. 1, 137, 81 S.Ct. 1357, 1431, 6 L.Ed.2d 625 (1961) (Black, J., dissenting).