David EDWARDS et al.

v.

MARYLAND STATE FAIR AND AGRICULTURAL SOCIETY et al.

Civ. No. Y–78–1601.

United States District Court, D. Maryland.

Aug. 17, 1979.

---

C. Christopher Brown, Baltimore, Md., Barry A. Fisher, and Robert C. Moest, Beverly Hills, Cal., for plaintiffs.

J. Frederick Motz, Alan H. Fisher, and Benson Everett Legg, Baltimore, Md., for defendants.

JOSEPH H. YOUNG, District Judge.

## I. THE FACTS

Each year during a ten-day period in late summer, the Maryland State Fair and Agricultural Society, Inc. ("Agricultural Society") sponsors the annual Maryland State Fair ("Fair") at the fair grounds in Timonium. The Fair provides an occasion at which agricultural interests throughout the State can gather to demonstrate farming techniques and machinery. At the same time, various exhibits and amusements, such as horseracing, attract large numbers of the general public as well, and the total number of visitors attending the the Fair each year approaches half a million.

On August 28, 1978, after the 1978 Fair had already begun, the individual plaintiffs in this case filed for injunctive and declaratory relief in the form of a temporary restraining order.[1] As devotees of the religion Krishna Consciousness which is formally known as the International Society for Krishna Consciousness ("ISKCON"), plaintiffs sought to enjoin the Fair, its Manager, the Chief of the Baltimore County Police, and the State's Attorney for Baltimore County from enforcing the Fair's so-called "booth rule." Under the booth rule, the Agricultural Society requires that all persons and groups, whether commercial, civic, political, or religious, who wish to solicit contributions, sell products, or distribute literature, must do so from a booth. According to defendants, the booth rule is uniformly and nondiscriminatorily enforced as a necessary means of achieving effective crowd control at the Fair.

Plaintiffs, on the other hand, contended that the booth restriction limited their freedom of expression in violation of the First

---

1. Plaintiffs invoked 45 U.S.C. § 1983 and 28 U.S.C. §§ 2201 and 2202.

and Fourteenth Amendments to the United States Constitution. According to their complaint, plaintiffs are members of ISK-CON, an international religious society espousing the missionary views of Hinduism as expressed by the Hindu denomination Krishna Consciousness. ISKCON maintains temples throughout the world, including one in Baltimore, and has been more fully described both in terms of its religious practices and organizational features in the many cases having already litigated the religious freedom issue raised here. *See, e. g., ISKCON v. Rochford*, 425 F.Supp. 734 (N.D. Ill.1977), *modified*, 585 F.2d 263 (7th Cir. 1978); *ISKCON v. Engelhardt*, 425 F.Supp. 176 (W.D.Mo.1977); *ISKCON v. Conlisk*, 374 F.Supp. 1010 (N.D.Ill.1973); *ISKCON v. New Orleans*, 347 F.Supp. 945 (E.D.La. 1972).

ISKCON members find the booth rule particularly offensive because of their religious obligation to perform the ritual known as Sankirtan which consists of gratuitously disseminating religious tracts, making converts, and soliciting funds to support the organization. "Sankirtan is directed to spreading religious truth as it is known to Krishna Consciousness, attracting new members and supporting ISKCON's religious activities. Donations and book distribution in exchange for contributions to defray printing and other distribution costs are the very lifeblood and principal means of support of this religious movement." Complaint at ¶ 10. According to ISKCON, restricting Krishna disciples to a booth would confine their movements and deny them the right to practice Sankirtan.

Because of the late filing of this case initially, plus the fact that granting plaintiffs' requested relief would have secured for them the entire relief sought for last year's Fair, Judge Harvey declined to issue a temporary restraining order. Consequently, the case was set in for ultimate trial on the merits. In the months following Judge Harvey's ruling, extensive discovery was conducted, and ISKCON's Baltimore Chapter was added as a corporate plaintiff. The case is now before this Court on cross motions for summary judgment which raise two issues: (1) whether enforcement of the booth rule by the Agricultural Society constitutes sufficient state action in this context to satisfy the "color of state law" requirement of 42 U.S.C. § 1983, and (2) whether the booth rule represents a reasonable time, place, and manner restriction upon the exercise of plaintiffs' First Amendment rights.

## II. THE STATE ACTION REQUIREMENT

■ Both section 1 of the Fourteenth Amendment and the First Amendment proscribe only governmental activities.[2] Private parties, consequently, are excluded from their scope to the extent that no state action is involved in the alleged constitutional violation. As the Supreme Court made clear almost a century ago, "[i]ndividual invasion of individual rights is not the subject-matter of the [Fourteenth] amendment." *Civil Rights Cases*, 109 U.S. 3, 11, 3 S.Ct. 18, 21, 27 L.Ed. 835 (1883). More recently, the Supreme Court has remarked that "[p]rivate conduct abridging individual rights does no violence to the [Fourteenth Amendment] unless to some significant extent the State in any of its manifestations has been found to have become involved in it." *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961).

■ To prevail in their claim under 42 U.S.C. § 1983, plaintiffs must demonstrate

**2.** Section 1 of the fourteenth amendment reads in part:

No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny any person within its jurisdiction the equal protection of the laws.

The first amendment reads:

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

that the defendants acted under color of state law to deprive them of their constitutional rights. Deciding whether or not particular action rises to the level of state action sufficient to permit the enforcement of constitutional rights in a lawsuit is not always a straightforward task. A review of the most prominent Supreme Court rulings on state action will reveal that instead of a unified, coherent, readily applicable theory, the Supreme Court has instead left us with a series of examples crying out for a common theory. The Court has already noted that formulating an infallible state action test is an impossible task. *Reitman v. Mulkey,* 387 U.S. 369, 378, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967). One scholar, after surveying its doctrinal development, has referred to the state action doctrine as "a conceptual disaster area." Black, *The Supreme Court, 1966 Term-Forward: "State Action," Equal Protection, and California's Proposition 14,* 81 Harv.L.Rev. 69, 95 (1967).

While there is little question that the Supreme Court's developments in this area have been uneven and occasionally contradictory,[3] the Court's more recent cases have recognized that what is needed is not a unitary state action doctrine but rather a flexible approach by which the dividing line between state and private action depends less upon a search for quantitative factors such as those used in a minimum contacts inquiry but more upon a sensitive balancing of the competing interests at stake as well as the relationships between state activity and the alleged discrimination. *See, e. g., Columbia Broadcasting System, Inc. v. Democratic National Committee,* 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973); *Norwood v. Harrison,* 413 U.S. 455, 93 S.Ct. 2804, 37 L.Ed.2d 723 (1973).[4]

**3.** *See, e. g.,* the discussion of *Amalgamated Food Employees Union Local 590 v. Logan Valley Plaza, Inc.,* 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968), *Lloyd Corp., Ltd. v. Tanner,* 407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1972), and *Hudgens v. N.L.R.B.,* 424 U.S. 507, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976), in Glennon & Nowak, *A Functional Analysis of the Fourteenth Amendment "State Action" Requirement,* 1976 Sup.Ct.Rev. 221, 224–27.

**4.** Professor Tribe suggests rightly that in a society which must recognize what he calls a "pluralist jurisprudence of rights," no single theory of liberty can emerge: "Contemporary constitutional law recognizes and protects individual rights without reference to a single, necessarily procrustean theory of liberty. Rights instead give legal expression to a series of distinct if related values which the Supreme Court has found to be implicit in the constitutional plan." L. Tribe, American Constitutional Law 1157 (1978).

With specific reference to state action he added:

Unitary state action doctrine cannot coexist with a pluralist jurisprudence of rights, but to abandon the concept of unitary doctrine is not to give up all possibility of explaining the Supreme Court's state action decisions. The "antidoctrinal" assumption that state action decisions should give effect to the values which underlie the specific rights litigants assert need not preclude an analysis which treats state action problems as comparable in form if not in resolution. On this view, the state action requirement performs a function more complex than the threshold rule which a unitary doctrine would assign to it. The state action requirement fixes a frame of reference. The substantive constitutional right at issue initially determines the parameters of this frame. Ultimately, however, it is the frame itself which determines the relevance of the right to the inquiry. *Id.* at 1158.

What this analysis yields is yet another occasion for the application of judicial balancing. Simply totting up the number of state contacts is no longer a proper way of resolving close state action questions. In *Seidenberg v. McSorley's Old Ale House, Inc.,* 317 F.Supp. 593 (S.D.N.Y.1970), the court explained that:

The right of equal protection must be balanced against the countervailing rights of individual freedom of association and freedom of choice that govern in private matters. . . .

In determining whether state involvement has risen to the level of "significance" for state action purposes, therefore, inquiry should focus upon the alleged sphere of privacy and autonomy in need of protection from federal intervention, as well as the customary search for some causal relation[ship], however tenuous, between state activity and the discrimination alleged. 317 F.Supp. at 597.

Outcomes today will turn on judicial balancing which will be heavily influenced by the particular rights asserted:

[T]he nature or degree of government involvement can never alone resolve the state action issue when arguably private actors are involved. . . .

In an early public function case, *Marsh v. Alabama*, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946), the Supreme Court employed a balancing approach to determine whether constitutional rights could be enforced. The issue in *Marsh* was whether a company town's streets were public or private such that the town owners could invoke state trespass laws against Jehovah's Witnesses who were distributing religious literature on the streets. Although considered a public function case, *Marsh* actually avoided deciding whether the town's streets were in fact public property. Writing for the majority, Justice Black saw the central issue as whether private property rights enforceable through the state's trespass laws could be enforced at the expense of free speech rights. He resolved the conflict by reference to the nature and use of the property as well as the constitutional right invoked. As to the property, he said:

> Ownership does not always mean absolute dominion. The more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it.

326 U.S. at 506, 66 S.Ct. at 278. As to the competing rights, he explained that "[w]hen we balance the Constitutional rights of owners of property against those of the people to enjoy freedom of the press and religion, as we must here, we remain mindful of the fact that the latter occup[ied] a preferred position." 326 U.S. at 509, 66 S.Ct. at 280.

In the years after *Marsh,* however, the balancing approach gave way to a "symbiotic relationship" test by which the presence of such a symbiosis between the State and a private party who was discriminating illegally could involve the State as a joint participant in the unlawful conduct so as to render the activity subject to the fourteenth amendment. *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). The *Burton* court also referred to the need for "sifting facts and weighing circumstances" in evaluating competing claims. 326 U.S. at 722, 66 S.Ct. 276. Only in recent years has state action analysis shown a tendency to abandon a quantitative contacts analysis in favor of the earlier balancing approach of *Marsh.* See, e. g., *Evans v. Abney,* 396 U.S. 435, 90 S.Ct. 628, 24 L.Ed.2d 634 (1970); *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972); *Lloyd Corp., Ltd. v. Tanner,* 407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1972); *Columbia Broadcasting Systems, Inc. v. Democratic National Committee,* 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973); *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974). While these cases have been interpreted as signaling a restrictive trend in state action analysis,[5] that result is not necessarily inherent in a balancing approach. While perhaps less talismanic than a quantitative "symbiotic relationship" approach, today's balancing process is a welcome development because it encourages the flexibility needed to resolve conflicts among competing constitutional values. If Professor Tribe is correct in describing contemporary constitutional law as a "pluralist jurisprudence of rights," then balancing is the appropriate means for articulated, thoughtful judicial resolution of such hard cases.[6]

27 . . In close cases today, the issue turns on an analysis of the government obligations and individual rights brought into conflict. Within this analysis, particular individual rights enjoy differing levels of constitutional protection.

Note, *State Action and the Burger Court,* 60 Va.L.Rev. 840, 854 (1974).

5. For a discussion of this trend, *see* Note, *State Action After* Jackson v. Metropolitan Edison Co.: *Analytical Framework for a Restrictive Doctrine,* 81 Dickinson L.Rev. 315 (1977).

6. Balancing, of course, can also serve as yet another mask to obscure the operation of unarticulated value judgments:

> The Supreme Court's decisions on state action reflect how the judicial balancing of rights functions to sort out those private activities whose collision with other rights makes them constitutionally infirm. While the balancing has nothing to do with finding a minimum quantum of state activity, the process of sorting out proscribed activities has occurred under the guise of a formalistic search for an undefined minimum amount of

Although *Moose Lodge, supra,* has recently been characterized as presenting a new "close nexus" theory in contrast to *Burton's* symbiosis test,[7] it presents an excellent example of the emergent balancing trend. Writing for a majority, Justice Rehnquist upheld the ability of a private social club to enforce a discriminatory guest policy even though petitioners agreed that state action was involved by virtue of the club's having obtained a state liquor permit. *Burton* was explicitly distinguished because the Eagle restaurant in that case was a public restaurant in a public building, not a private club in a private building. 407 U.S. at 175, 92 S.Ct. 1965. In terms of the *Marsh* Court's analysis, *Moose Lodge* did not involve the loss of privacy entailed in *Burton* when a restaurant operates publicly. According to one commentator, then, the outcome turned less on the nexus of the state's relationship as it did on a characteristic of the right involved and the strength of that interest:

> the private club more closely resembles a private home than a restaurant does; it stands nearer the private end of the public-private dichotomy enunciated in the *Civil Rights Cases.* Consequently, a

club's associational rights carry greater weight than those of a restaurant. This additional privacy interest, absent in *Burton,* seems to tip the scale toward the proprietor in *Moose Lodge.*

Note, 60 Va.L.Rev., *supra,* at 850.

■ Having reviewed these more recent approaches to state action analysis, the Court must now apply a balancing analysis which evaluates not only the overall relationship between the state and private entities (regardless of whether it is termed a "symbiosis" or a "nexus") but also the relationships between competing liberty interests and constitutional values. Utilizing this analysis, the Court finds that the relationship between the State of Maryland and the Agricultural Society is sufficient to find that the enforcement of the booth rule constitutes state action.

Several facts support this finding. The Fair is definitely a public function. It is open to the public and constitutes a public forum frequently used by political, religious, and civil groups. The Maryland Annotated Code authorizes the creation of a Maryland State Fair Board ("Board"), an executive state agency, which has designat-

---

state acts. In practice, when the challenged practice deserved state protection the Court has ruled that state action is lacking, declaring in effect that the practice is compatible with the Fourteenth Amendment. When the harm to protected rights outweighed the value of the challenged practice, the Court has found sufficient state action, which made easy a final ruling of unconstitutionality. Glennon & Nowak, *supra,* at 232.

Value judgments are constantly at work in the judicial balancing process and are nonetheless minimized by the more "quantitative" theories such as the degree of government regulation or control, the amount of government support, the enforcement of policies by governmental officials or institutions, the delegation of governmental power, performance of a public function, entwinement, or conspiracy. Note, 81 Dickinson L.Rev., *supra,* at 326–38. After identifying the presence or absence of any of these factors, one is still faced with the qualitative dilemma of assigning relative strengths and evaluating their roles in the overall fabric of competing rights.

To the extent that balancing is less formalistic and more candid, however, it can frequently serve constitutional adjudication by fostering more reasoned articulation.

7. *See, e. g., Greene v. Johns Hopkins University,* 469 F.Supp. 187 (D.Md.1979), where Chief Judge Northrop described *Moose Lodge* as "confirm[ing] the presence of a second State action theory—a close nexus between the State's involvement with the private party and the alleged discriminatory activity—when it focused on the question of whether the State directly fostered or encouraged the discriminatory policy or practice in that case." 469 F.Supp. at 194.

While noting that the Supreme Court has failed to clarify whether the "overall relationship" or the "close nexus" theory is to be preferred, Chief Judge Northrop concludes that Fourth Circuit case law seems to point increasingly towards preferring the close nexus approach. 469 F.Supp. at 195. *See generally, Fourth Circuit Review,* 35 WASH. & LEE L.REV. 433 (1978). *Greene,* however, presented a fairly narrow question, namely whether the university's receipt of de minimis state funds made it a State agency, and did not involve a conflict between competing governmental and personal values.

ed the Fair as the "Maryland State Fair." Md.Agric.Code Ann. §§ 10–301 *et seq.* Section 10–303(d) governs the promotion of fairs and exhibits in the State and calls for submission of an annual report by the Agricultural Society to the General Assembly "outlining the current progress and plans for the following year for the construction, expansion, relocation, replacement, and modernization of the Society's facilities and equipment used in conducting the State Fair."

Furthermore, the State's financial promotion of the Fair is evidenced in several areas. The Agricultural Society receives annually some $115,000.00 from the Board to be awarded as premiums to successful fair contestants.[8] In 1977, the Maryland General Assembly granted the Agricultural Society $1,000,000.00 per year for capital improvements over a five year period. Annual reports as to how this money is spent must be submitted to the Board of Public Works.

Finally, plaintiffs note two other aspects indicative of the State's involvement in the Fair. The Board leases office space from the Agricultural Society, and State Police protect the general public attending the Fair and direct traffic outside the grounds.

█ Contesting that these factors either individually or in their totality are sufficient to constitute state action, defendants argue that the Fair cannot be considered a public function. They note that conducting a fair is not traditionally the State's sole prerogative and that the State has no affirmative duty to have a fair. While this point may be true, it cannot contravene the fact that the State has chosen to conduct such an enterprise. Having done so, the State cannot shield itself from possible constitutional scrutiny for its activities merely because its involvement was with private entities or on a voluntary basis. Even under the more restrictive interpretations of state action analysis, the State certainly "must be recognized as a joint participant

in the challenged activity . . . ." *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 172–73, 92 S.Ct. 1965, 1971, 32 L.Ed.2d 627 (1972), *quoting Burton v. Wilmingon Parking Authority,* 365 U.S. 715, 725, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961).

Defendants further contend that under *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 352–53, 95 S.Ct. 449, 454, 42 L.Ed.2d 477 (1974), state action cannot be found under the public function test unless the private party exercises powers "traditionally exclusively reserved to the State" or performs functions that the State has an affirmative duty to provide. *See also New York City Jaycees, Inc. v. United States Jaycees, Inc.,* 512 F.2d 856, 859–60 (2d Cir. 1975). While it is true that the State need not authorize and hold the Fair, at most defendant's reasoning supports the conclusion that perhaps the public function test is the inappropriate one to apply in these circumstances. Assuming *arguendo* that the Fair is not a public function, there are nonetheless several remaining state action theories supporting the Court's conclusion that the state action requirement has been satisfied. Among these theories are the amount of government regulation, control, or support, the delegation of governmental power, and entwinement, all of which could be applied to the facts of this case.

Finally, since modern state action analysis requires some assessment of the competing interests involved, the Court cannot overlook the free speech interests at stake here plus the public-private dichotomy recognized in *Moose Lodge, supra.* The Fair is open to the general public, and, as such, is more analogous to the public restaurant in *Burton* than the private social club in *Moose Lodge.* Consequently, after examining the causal relationships between state activity and the alleged discrimination, the public nature of the Fair, and the nature of the particular rights being asserted, the Court concludes that the state action requirement is fully satisfied.

---

**8.** Receipt of these premiums is conditioned upon the Agricultural Society's complying with eleven regulations issued by the Board.

## III. THE BOOTH RULE

Even though the Court has found the Agricultural Society to be acting under color of state law, liability will only be found in the presence of a constitutional violation. Defendants recognize that the booth rule functions as a time, place, and manner restraint on plaintiffs' free speech rights; however, they justify it as a necessary form of crowd control which is uniformly applied to all Fair participants. As such, they maintain that the booth rule accomplishes a legitimate, compelling, and overriding governmental interest, is sufficiently focused to avoid overbreadth or overinclusiveness, and accomplishes its purpose in the least restrictive manner possible. *Nebraska Press Association v. Stuart*, 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976); *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975); *Grayned v. City of Rockford*, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972).

Within recent years, ISKCON has litigated the constitutional validity of the booth rule and other "time, place, and manner" restraints which confined their practice of Sankirtan at public events. ISKCON has generated an impressive track record with the majority of lower federal courts holding in their favor. *See, e. g., ISKCON v. State Fair of Texas*, 461 F.Supp. 719 (N.D.Tex. 1978); *ISKCON v. Bowen*, 456 F.Supp. 437 (S.D.Ind.1978); *ISKCON v. Rochford*, 425 F.Supp. 734 (N.D.Ill.1977); *ISKCON v. Engelhardt*, 425 F.Supp. 176 (W.D.Mo.1977); *ISKCON v. Conlisk*, 374 F.Supp. 1010 (N.D. Ill.1973); *ISKCON v. City of New Orleans*, 347 F.Supp. 945 (E.D.La.1972).[9] Only one Court of Appeals has ruled on ISKCON's claims, affirming the ruling in *Bowen, supra*, on the grounds that defendants had failed to show sufficient evidence that serious disruption would result from allowing Sankirtan to be practiced at large or that they were unable to regulate the activities in a less restrictive manner than by confining the religious activities to a booth. *ISKCON v. Bowen*, 600 F.2d 667 (7th Cir. 1979).

To date, only a few courts have ruled against ISKCON on the constitutional issues raised here. *See, e. g., ISKCON v. McAvey*, 450 F.Supp. 1265 (S.D.N.Y.1978); *ISKCON v. Evans*, 440 F.Supp. 414 (S.D. Ohio 1977); *ISKCON v. Heffron*, District Court, Second Judicial District, County of Ramsey, Minn. (File No. 421843 Aug. 18, 1978).

Plaintiffs contend that the booth rule fails to satisfy the standards of *Nebraska Press Association, supra*, and the line of cases developing that standard. In their motion for summary judgment, plaintiffs state that:

the interests advanced by the Maryland Fair are not so compelling as to justify the restriction imposed by the Regulation at issue. A certain measure of inconvenience, discomfort, litter or other incidental effect of First Amendment protected expression has never been sufficient justification for restricting such activity.

---

**9.** Besides these reported decisions, there have also been numerous unreported decisions holding in ISKCON's favor. *See, e. g., ISKCON v. Eaves*, Case No. 75–195 (N.D.Ga. May 3, 1975); *ISKCON v. Wetzel*, Case No. 75–450 (D.Ariz. Sept. 2, 1975); *ISKCON v. Lamb*, Case No. 75–88 (D.Nev. Oct. 17, 1975). Several unreported decisions have also granted temporary restraining orders upholding plaintiffs' rights to solicit at large at state fairs. *See, e. g., Clark v. Wisconsin State Fair Park Bd.*, Civ. No. 78–C–373 (W.D.Wis. Aug. 11, 1978); *Anderson v. Ionia Free Fair Ass'n.*, Civ. No. G–78–569 CA 1 (W.D.Mich. Aug. 7, 1978); *ISKCON v. Carey*, No. 77–CV–3281 (N.D.N.Y. Aug. 30, 1977); *ISKCON v. New Mexico State Fair Comm'rs*, No. 77–0568 Civil (D.N.Mex. April 28, 1977).

Numerous state fairs have entered into consent decrees allowing ISKCON devotees to solicit without being confined to a booth. *Winslow v. Kansas Fair Bd.*, Civ. No. 78–1374 (D.Kan.); *Mills v. State Fair of West Virginia*, No. 78–5167 (D.W.Va.); *Gorrick v. Erie County Agric. Ass'n.*, Civ. No. 78–505 (W.D.N.Y.).

Finally, the Attorneys General of at least six states have issued letter opinions declaring ISKCON devotees' rights to be free from booth restrictions. *See* Letters from the Attorneys General of Florida, Kentucky, Michigan, New Mexico, North Carolina, and Pennsylvania, attached as Exhibits 10 through 15 of Plaintiffs' Memorandum in Support of Temporary Injunction.

Plaintiffs' Memorandum in Support of their Motion for Summary Judgment at 20. Defendants respond that their concerns are not merely ones dealing with inconvenience, discomfort, or litter but reflect genuine needs for effective crowd control. By requiring all vendors, exhibitors, concessionaires, pamphleteers, and solicitors to operate from booths and other fixed locations, the booth rule promotes order and public safety, prevents congestion by keeping aisles open, and gives Fair visitors and concessionaires equal access to each other in order to ensure better freedom of choice.

■ The solicitation of donations and the selling of religious literature to further one's religion are activities fully protected by the First Amendment. *Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); *Murdock v. Pennsylvania,* 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943). Prior restraints imposed upon such activities are inherently suspect, *Shuttlesworth v. Birmingham,* 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969), and can only be justified when there is a compelling governmental interest, the existence of which the government must prove. *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976).

■ There exist, however, certain circumstances in which First Amendment privileges in a public forum have been circumscribed by the imposition of reasonable regulations which are focused to regulate the time, place, or manner of speech. *Police Department of the City of Chicago v. Mosley,* 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972); *Poulos v. New Hampshire,* 345 U.S. 395, 73 S.Ct. 760, 97 L.Ed. 1105 (1953); *Kunz v. New York,* 340 U.S. 290, 71 S.Ct. 312, 95 L.Ed. 280 (1951); *Kovacs v. Cooper,* 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949); *Cox v. New Hampshire,* 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941). Any such regulations, however, must further a substantial governmental interest which has no relation to the content of the First Amendment expression involved. *Mosley, supra,* 408 U.S. at 98, 92 S.Ct. 2286. Additionally, the regulations must be precisely tailored and present standards capable of objective application in order to avoid giving overbroad discretion to the officials charged with implementing them. *Niemotko v. Maryland,* 340 U.S. 268, 71 S.Ct. 325, 95 L.Ed. 267 (1951). *See also Toward A Gayer Bicentennial Committee v. Rhode Island Bicentennial Foundation,* 417 F.Supp. 632 (D.R.I.1976).

The majority of federal district courts which have considered the validity of prior restraints on ISKCON activities in varying locations and forums have failed to uphold the regulations under the time, place, or manner rationale. A number of these cases can, however, be distinguished or limited on their facts.

In *ISKCON v. Kearnes,* 454 F.Supp. 116 (E.D.Cal.1978), a city ordinance requiring persons engaging in charitable solicitation to obtain permits was held to be facially unconstitutional. The court reasoned that prevention of fraud was an inadequate justification for the ordinance which indirectly sought to regulate the content of speech. The time, place, or manner limitations were not involved since the court noted that the ordinance made no attempt "to accommodate both the rights of those seeking to solicit and collateral state interests such as traffic control." 454 F.Supp. at 119.

*ISKCON v. Griffin,* 437 F.Supp. 666 (W.D.Pa.1977), held invalid a county ordinance imposing numerous regulations requiring inter alia a permit, payment of a daily fee, and restriction of solicitations to booths and certain times in connection with the operation of a local airport. Holding the regulations unconstitutional, the court focused its attention primarily on the absence of narrow, objective, and definite standards which resulted in arbitrary determinations such as the restricting of ISKCON activities to within ten feet of any area leased exclusively to an airport tenant. Similarly, the booth rule was also invalidated because "[t]he defendants [had] asserted no justification for limiting ISKCON's First Amendment rights in such a manner." 437 F.Supp. at 673.

Both *Kearnes* and *Griffin* differ from the present case in light of the fact that the

Maryland Fair's regulation is specifically aimed at promoting manageable crowd control in order to accommodate state interests in traffic control and the interests of solicitors. *See* Affidavit of Howard Mosner, Jr., General Manager and Vice-President of the Agricultural Society. Since the regulations apply across the board to all concession-aires, there is no room for arbitrary official action.

Although *Kearnes* and *Griffin* found for ISKCON, their holdings can be limited in such a fashion that valid time, place, or manner restraints might nonetheless be imposed if they are properly drafted, applied, and justified. For the most part, the courts which have found in ISKCON's favor have done so because of this final point, namely, justification. To evaluate the validity of an offered justification, however, is necessarily to undertake a balancing of the competing interests involved. Thus, in *ISKCON v. Bowen,* 456 F.Supp. 437 (S.D.Ind.1978), the court held unconstitutional a booth rule similar in effect to Maryland's. Chief Judge Steckler ruled that "[i]t is clear that adoption of the resolution for a salutory purpose (*e. g.,* so that fairgoers are assured the maximum opportunity to enjoy the Indiana State Fair) will not save what is otherwise a constitutionally deficient regulation of expression." 456 F.Supp. at 443. Citing *Cantwell, supra,* the court opined further that "[a] certain amount of inconvenience, discomfort, litter or other incidental effects of first amendment protected activity is not a sufficient justification for restricting such activity." 456 F.Supp. at 444. The court concluded that "under any test applied to restrictions on expression, the Indiana Fair rule is not sufficiently, narrowly, and precisely related to the interests advanced by the State." 456 F.Supp. at 444.

Plaintiffs rely heavily on *ISKCON v. State Fair of Texas,* 461 F.Supp. 719 (N.D. Tex.1978), a case which is virtually identical to the instant one. The Texas State Fair draws an annual crowd of over three million people over a 250 acre tract, and the State had offered valid crowd control as a legitimate justification for its booth rule.

In holding the rule unconstitutional, however, Judge Higginbotham noted both the effect of the booth rule on Sankirtan and the inadequate justification provided by the State:

> In order to understand the impact of the place restriction on ISKCON, it is necessary to appreciate the nature of that religion. The devotees of this sect of hinduism carry a duty to perform an evangelical ritual called "Sankirtan." It consists of spreading the "truth" and soliciting. The donations and book sales are the lifeblood of the temple, providing sole support for its temple and members. It involves a one-to-one exchange. It cannot be exercised from a 30-foot booth with any degree of effectiveness—not when the fair grounds sprawl over approximately 250 acres. The inescapable fact is that the impact of the booth restriction upon the protected activities of ISKCON devotees is markedly different from its impact on other commercial vendors. Accordingly, a true balancing of interests requires a correspondingly greater justification for the place restriction. If the restriction as to place would be valid as to most other State Fair Lessees who lack similarly unique interests, the primary justification (controlling vendor location to avoid chaos) for the place restriction is absent. The State Fair's remaining justification for the place restriction is the need to prevent misrepresentation in the Krishna solicitation efforts. The State Fair has an understandable interest in policing all conduct for violations of state criminal laws. The evidence suggests that it is doing so with vigor. The place restriction, however, is not so tailored to the problem as to justify this restraint. This legitimate concern with preventing fraud and theft cannot justify a rule which prohibits all devotees from practicing Sankirtan in a public forum. It would be a specie of prior restraint and would require strong justification.

461 F.Supp. at 723. Oddly enough, after finding in ISKCON's favor, the court went

on to impose a condition of its own making upon the practice of Sankirtan. Fearful that fraud might result if the Krishnas were permitted to roam throughout the fairgrounds with the "anonymity of the commercial vendor" protected by the First Amendment, the court ruled that "the Krishnas may openly practice their 'Sankirtan' without place restriction. But if they are to go in disguise and 'give away' flowers with no distribution of literature or disclosure of purpose, they must obtain a booth." 461 F.Supp. at 724. The court concludes that the impact of this restriction upon Sankirtan is simply to reduce the amount of solicitations available.

This result, however, seems at odds with the court's initial premises. A negative impact upon Sankirtan is a negative impact whether it is created by a booth rule or a no-disguise rule. First Amendment freedoms should not depend on whether a Krishna wears a Brooks Brothers' suit or the more familiar flowing gowns and pony tails associated with their spirited group appearances on city streets. Freedom of expression can no more be regulated on the basis of content than on the basis of a speaker's clothing. Judge Higginbotham is moved by the spectre of the retarded child from a state home being conned out of his allowance at a state fair in the name of religion, but surely the likelihood of this occurring repeatedly is hardly sufficient to confine Krishnas in three-piece suits to booths! In the marketplace of religious freedom of choice, some degree of *caveat emptor* must prevail, and individuals must be presumed competent to think before they contribute. As the court aptly noted, "[a] fair is almost by definition a congeries of hawkers, vendors of wares and services, and purveyors of ideas, commercial, esthetic, and intellectual." 461 F.Supp. at 721. *Caveat emptor,* then, is just a more refined expression for the adage that "a sucker is born every minute," and at events such as fairs and circuses, one expects this to be applicable more than at other times. While *ISKCON v. State Fair of Texas* may initially tend to support plaintiffs' position, its reasoning makes any victory pyrrhic at best. At the same time, one can fault the court for having imposed its no-disguise restriction on the basis of hypothetical fraud when the problem created by crowd control was in every respect both real and serious.

What the above cases demonstrate is that a court's appraisal or balancing of competing values will depend to a large part on judgments it makes as to the relationship between the state interest and the constitutional guarantee. In *ISKCON v. McAvey,* 450 F.Supp. 1265 (S.D.N.Y.1978), the court struck a different balance and refused to enjoin enforcement of regulations governing Sankirtan in lower Manhattan's World Trade Center. These regulations limited the number of devotees who could practice Sankirtan as well as the place and manner in which they could conduct their activities. The court specifically sanctioned the Port Authority's crowd control rationale:

> It is clearly the province of the Port Authority to set reasonable limits on the number of persons who may engage in an activity that is likely to disrupt the orderly flow of traffic in the Trade Center, *see Wolin v. Port Authority of New York,* 392 F.2d 83, 94 (2d Cir. 1968).

450 F.Supp. at 1269.

After reviewing the authorities cited by plaintiffs to support their claim that the booth rule is unconstitutional, this Court feels compelled nonetheless to resolve this issue in line with the minority of courts which have found such restrictions to constitute legitimate means of crowd control. *McAvey, supra; ISKCON v. Evans,* 440 F.Supp. 414 (S.D.Ohio 1977). What is being balanced here is not religious *belief* versus state interest but religious *conduct* versus state interest, and although belief and conduct cannot be completely divorced from one another, time, place or manner restrictions are permissible when what they regulate is behavior rather than ideas. "[T]he freedom to act, even when the action is in accord with one's religious convictions, is not totally free from legislative restrictions." *Braunfeld v. Brown,* 366 U.S. 599, 603, 81 S.Ct. 1144, 1146, 6 L.Ed.2d 563

(1961). As the *Evans* court explained, "[w]here religious conduct conflicts with an important societal interest, a delicate balancing is in order and it is not at all fore-ordained that the rights of the individual will prevail." 440 F.Supp. at 421, *citing Prince v. Massachusetts,* 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944); *Reynolds v. United States,* 98 U.S. (8 Otto.) 145, 25 L.Ed. 244 (1878).

The Maryland Fair's booth rule is uniformly applied to all concessionaires without distinction. It does not seek to curtail any speech on the basis of its content, and it has been adopted pursuant to a valid concern for crowd control. ISKCON members may still solicit contributions and make religious converts, albeit confined to the interior of a booth. To allow them more freedom would grant them an advantage over other vendors or concessionaires who must rely on individuals' freedom of choice to patronize their particular booths. Space at the Fair is limited, and with so many groups and organizations vying for the public's attention, a booth rule makes obvious practical sense as a means of crowd control as well as a means of guaranteeing even access to all booths at the Fair. ISKCON will still be permitted to disseminate its religious beliefs to all who want to hear them. While this Court has no doubt that Sankirtan is a legitimate religious ritual, granting plaintiffs' requested relief would obviously risk the possibility that other groups would claim to be "religious" and therefore invent some unorthodox religious rituals which, being important to their newly created faith, would inflict themselves upon fairgoers in the name of religious freedom.

Professor Tribe notes that "[o]ur society is truly one in which one person's seemingly bizarre cult, easily dismissed by an outsider as insincerely held, is another's true religion. And, to the extent that we achieve the goal of religious pluralism, the problem becomes still more complex." L. Tribe, *supra,* at 861, n. 13.

Nevertheless, courts have had to rule on religious practices which have raised the question of sincerity of religious belief. *See, e. g., United States v. Kuch,* 288 F.Supp. 439, 445 (D.D.C.1968) (no religious exemption from federal drug regulations where only a tactical pretense of religion involved; Neo-American Church members were known as Boo Hoos and adopted a seal displaying a three-eyed toad and "Victory over Horseshit" as their motto). Contrast *Kuch,* however, with *People v. Woody,* 61 Cal.2d 716, 40 Cal.Rptr. 69, 394 P.2d 813 (1964), in which the California Supreme Court declared unconstitutional the application of state criminal statutes to Native Americans using peyote in a religious ritual.[10] The court found the prohibition of peyote to be insufficiently related to public health goals and recognized that use of the drug as a sacrament was central to the religious observance. The court referred to it as the *"sine qua non* of defendants' faith." 61 Cal.2d at 725, 40 Cal.Rptr. at 76, 394 P.2d at 820.[11]

Tribe also examines the difficulty courts face in evolving a workable definition of "religion" for purposes of the free exercise and establishment clauses. Under the free exercise clause "a dichotomy can usefully be drawn between things 'arguably religious' and things not even arguably having a religious character; all that is *'arguably religious'* should be considered religious in a free exercise analysis." L. Tribe, *supra,* at 828. Tribe comments that:

At the very least, it should therefore be clear that, when free exercise issues are raised, religious claims are to be examined not in terms of the majority's con-

---

**10.** "Peyotism" has been described as "an intertribal American Indian religion adopting Christian elements to traditional tribal beliefs and practices and distinguished by the sacramental use of peyote." Webster's Third New International Dictionary 1692 (1971).

**11.** For a thorough discussion of the significance of sincerity and centrality insofar as judicial evaluations of religious practices are concerned, see L. Tribe, *supra,* at 859–65. *See also* Giannella, *Religious Liberty, Nonestablishment, and Doctrinal Development—Part I. The Religious Liberty Guarantee,* 80 Harv.L.Rev. 1381, 1394–96, 1417–21 (1967).

cept of religion but in terms of the social function of the group, or in terms of the role the beliefs assume in the individual's life. The broad construction of religion proposed for free exercise by the "arguably religious" test would be a useful adjunct to any such examination.

L. Tribe, *supra*, at 831. Yet, one can envision potential conflict between this "arguably religious" test and the centrality test, since some activity could be arguably religious yet not central enough to overcome curtailment in appropriate circumstances.

Precisely this conflict arises in the present case. While the Court recognizes that dissemination of religious information lies at the core of religious practice, second perhaps only to worship, L. Tribe, *supra,* at 863, the practice of Sankirtan can be distinguished from the situation in *People v. Woody, supra.* Both Hinduism and Buddhism have centuries-old traditions emphasizing the importance of begging and almsgiving.[12] Contributing is looked upon as a means of attaining nirvanic merit. Insofar as ISKCON members are concerned, however, the contemporary practice of Sankirtan is but one manifestation of their religious practice and is by no means claimed to be a central aspect of worship. Unlike the use of peyote in *Woody,* Sankirtan has never purported to be the *sine qua non* of the Krishna religion.

The Court want to emphasize that it is expressing no doubts as to the legitimacy, sincerity, or seriousness of ISKCON's religious claims. In order, then, to accommodate both ISKCON's interest in disseminating its religious views and the State's interest in maintaining proper crowd control at the Fair, certain practical limitations must be drawn given the circumstances and context of this case. The booth rule provides such a reasonable accommodation and passes constitutional muster.

12. Begging and almsgiving are found in both Buddhism and Hinduism as important religious customs. Although more prevalent among the former, these practices are especially important to Hindu worshippers of Vishnu, and in particular the Bhakti cult from which Hare Krishnas trace their spiritual origins. These classical religious sources also explain ISKCON members' frequent appearance in flowing garments,

The Court is satisfied that there are no genuine issues in this case respecting any material propositions of fact, and defendants are therefore entitled to judgment as a matter of law. F.R.Civ.P. 56.

Accordingly, it is this 17th day of August, 1979, by the United States District Court for the District of Maryland, ORDERED:

1. That plaintiffs' motion for summary judgment be, and the same is, hereby DENIED; and

2. That defendants' motion for summary judgment be, and the same is, hereby GRANTED.

with shaved heads, as well as their practice of chanting. *See generally,* A. Basham, The Wonder That was India 280 (1st Evergreen ed. 1959); E. Conze, Buddhism: Its Essence and Development 54–58 (1959); and 1 B. Walker, The Hindu World 437 (1968) (discussion of the bhikshu, or Hindu almsman, and his importance).